

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00094-CR

_____

LATOYA SMITH, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd Judicial District Court
Bowie County, Texas
Trial Court No. 07F0378-202

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

The physical abuse suffered by the victim in this case over a period of days was reminiscent of torture reportedly used by rogue captors to break military prisoners. Two attackers repeatedly assaulted the much smaller and weaker victim, sometimes kicking her, sometimes slamming her into the wall, sometimes striking her with belts. They made her stand barefooted and motionless for hours at a time, sometimes atop an overturned plastic milk crate cast using a large open grid pattern, which caused her additional pain. When she faltered, she was further assaulted. As if the victim had not suffered enough, on the final day of the attacks, her female attacker repeatedly pushed the exhausted victim backward onto the floor. Each fall caused the victim's head to hit the floor; the last time hard enough so a witness heard the victim's "brain crack." The victim, River Phoenix Williams, died from her injuries.

River Phoenix was two years old. The attackers were her father and the father's live-in girlfriend.

Just as River Phoenix had been entitled to the protections of the law, her attackers, too, are entitled to all applicable protective provisions of the law.

Latoya Smith, the live-in girlfriend, was convicted in River Phoenix's death, after River Phoenix's father, Neil Patrick Dewitt, had pled guilty to the same crime.

Sentenced to life imprisonment without parole, Smith appeals, urging a number of arguments but making no challenge to the sufficiency of the evidence to prove the offense of

capital murder. We affirm the trial court's judgment because (1) the State's nondisclosure of certain evidence did not require an in camera inspection of the State's file or a mistrial, (2) no Confrontation Clause violation arose from the trial court's rulings regarding the testimony of Wade and Roberson, (3) admitting River Phoenix's autopsy report did not violate the Confrontation Clause, (4) excluding evidence of Smith's mental health history during the guilt/innocence phase was not error, and (5) admitting evidence of Smith's prior behavior and attitude toward River Phoenix was not error. We address the arguments in that order, after recounting the facts in greater detail.

Before her death, River Phoenix lived with Dewitt, Smith, and River Phoenix's minor sister, K.T. Dewitt admitted that he was party to the abuse that caused his child's death, pled guilty to capital murder, and also received a sentence of life imprisonment without parole. He testified against Smith during her trial, consistently said that the two of them killed River Phoenix, and enlightened the jury on the origins of Smith's jealousy, dislike, and abuse of River Phoenix, who was Dewitt's daughter by another woman. Dewitt stated, "When I found out that [River Phoenix] was my child, [Smith] had said, well, there's your child you could've had with me." Dewitt also testified that Smith would never accept River Phoenix, and felt that Dewitt "cheated on her because [River Phoenix] came in after we were together." Smith's journal complained that Dewitt told River Phoenix that Smith was picking on her.

> So now whenever I come in the room when she's eating she stops eating and
> watches me like I'm the TV . . ., so now I don't go into any room that she's in and I

3

don't say anything to her and I leave her and [Dewitt] alone and they seem to do just fine without me around. Good news, she goes home [to her mother] on the first of the month. The bad news is today is only the 27th of the month. I have never disliked a child so much in my life. I wish she didn't exist.

For this reason, both Dewitt and K.T. testified, Smith had a "bad" relationship with River Phoenix resulting in child abuse.

Some of Smith's treatment of River Phoenix was described by Kiara Kashawn Wade and her mother, Evelyn Roberson. Smith, a stay-at-home hair stylist, booked an appointment with Wade for hair braiding. When Wade and Roberson arrived, they noticed that River Phoenix was left in the back yard alone. Wade testified:

When [Smith] started to braid my hair, [River Phoenix] was standing next to us, and [Smith] didn't like that. She said, go play with the toys or go play with the dog. And [River Phoenix] didn't move, she just stood there. And that's when [Smith] went on saying, we bought her all these toys and she don't play with them, and she ended up siccing the dog on the baby, making the baby cry . . . . [Smith] was just putting the dog on the baby.

Wade asked Smith to stop, to which Smith replied, "[I]f you don't like it, then you can take her home with you." Smith then forced River Phoenix to stand in a corner for seven hours. "After she put her in a corner, [River Phoenix] kept crying . . . . But as [Smith] was talking to me . . . . she was talking about [River Phoenix's] mother, she was throwing stuff at the baby; hairbrushes, she threw some grease at her, and she threw a shoe at her." Smith reportedly told Wade that she hoped Dewitt "did get custody of the baby, that way she could do what she wanted to with [River Phoenix]." Wade said, "[Y]ou could tell [River Phoenix] wanted to sit down. You know, a

4

baby's legs . . . she was shaking . . . .   She had been standing for almost six hours now."   At one point, Smith checked River Phoenix's diaper, found it dirty, told her she stank, "smashed" the diaper against her, and "made her sit in it."   Smith refused Wade's offer of help to change the diaper.   When Wade offered River Phoenix food, Smith "knocked it out of [her] hand" and offered River Phoenix the food herself.   When River Phoenix backed away, Smith said that she had "a nasty attitude towards the people that take care of her, but with everybody else that she don't know she's very friendly."   Toward the end of the evening, Dewitt arrived and was instructed not to feed River Phoenix "anything because all the food in the house belonged to [Smith]."   The couple joked and "said they treat the dog better than they treat [River Phoenix] because her attitude is so messed up."   A distraught Wade returned to Roberson's house and reported the day's events.   Roberson attempted an intervention with Dewitt and Smith, which resulted in Smith cursing the child and blaming her for her stubbornness.   The couple told Roberson that River Phoenix "was the problem."

The problems continued.   The day before River Phoenix's death, she "was in her chair and didn't want to eat."   Smith became upset, yelled at the child, took her from the dinner table, and gave her a bath instead.   Then, River Phoenix was instructed to dress herself.   When the two-year-old was unsuccessful at this task, Smith spanked the child with a red leather belt that had a brass buckle, a weapon used regularly by Smith to beat the child.   Smith "had beat her for a while, and then she got increasingly frustrated and passed her to" Dewitt, who beat her with a

5

black leather belt. At one point, Dewitt "hit her once over the top of the head with the belt." Dewitt justified his actions by claiming to be supportive of Smith's theory that River Phoenix was coddled.

The couple passed the baby back and forth between themselves for continued beatings over the course of several hours. The whippings ended after Smith grabbed the child by her arms, "rammed her into the wall," "dropped kicked her out of the way," and walked away from her. As if the child had not suffered enough, she was later made to stand, without shoes, on a plastic crate cast with a large grid pattern in its plastic body. After Dewitt nudged her with his foot, River Phoenix fell from the crate, hit her head on a nearby nightstand, climbed back up, and continued to stand throughout the night.

The next morning, Dewitt left for work, and K.T. boarded her school bus. Dewitt had been "cheating on" Smith with another woman whom he met on the Yahoo Singles dating website. Smith discovered the website and called Dewitt at work to inquire about the other woman. He received angry telephone calls all day culminating in threats against River Phoenix's life, including one instructing Dewitt "to be careful when I pulled into the garage because [River Phoenix] would be lying there dead." Dewitt did not rush home.

Around 1:00 p.m., Karrie Sue McNeil arrived to clean the apartment next door. She noticed the unmistakable sound, coming from the Dewitt-Smith residence, of a baby crying and screaming in pain. The child continued to cry and scream for the entire hour and a half it took

McNeil to finish her job. While she contemplated reporting her suspicions, McNeil did not act on that idea.

K.T. testified that she returned from school that day to find River Phoenix "standing in the corner hunched over, and her knees—her legs were swelled up and she had bags under her eyes." Smith sat on the couch and would hit River Phoenix "with the belt on her legs" when the baby would fall down from standing. K.T. was forbidden to intervene. When Smith had her fill of this torture, K.T. was allowed to bathe River Phoenix. K.T. observed "[s]he had whip marks on her legs and on her back" and "nail marks on the back of her ear[s]." After the bath, K.T. took her baby sister to the living room where Smith was watching television. Smith "kneeled down in front of" the baby, and "pushed her down." River Phoenix fell backward, hit her head on the floor, and began to cry. When she stumbled up to a standing position, Smith twice repeated this action. As a result of the third push to the ground, K.T. heard River Phoenix's "brain crack." River Phoenix "laid there looking at the ceiling," and "was wobbling" after she managed to stand up again. K.T. could tell her sister was badly injured. She next witnessed Smith call Dewitt and tell him "[s]he was going to hang [River Phoenix] with her red belt." At 9:00 p.m., K.T. was sent to bed.

Dewitt finally arrived around 9:30 p.m. to find River Phoenix "in a full-blown seizure" while Smith sat apathetically on the couch watching television. Dewitt made the decision not to seek emergency medical care after observing the extensive bruising on River Phoenix's body. He

7

testified Smith sat on the couch "and kept rocking backing [sic] and forth, and she was like, I'm going to jail, I'm going to jail, I'm going to jail." River Phoenix suffered a second seizure. After putting River Phoenix in K.T.'s bedroom, Dewitt ate dinner and went to bed, while Smith stayed awake pacing the hall.

K.T. checked on her sister the next morning. "Her breathing was slowing down and her heart was slowing down." She informed her father, but went to school after his assurance that River Phoenix would be fine.

Shortly thereafter, River Phoenix died.

The couple "talked about blaming it on [K.T.] and saying that [K.T.] had kept hitting her, and that [Dewitt] would drive and dispose of the belts." While Dewitt was disposing of evidence, Smith called the police.

Officer Latriesha Grandy spoke with Smith, who "didn't show any concern for River Phoenix or her well-being or the kind of shape she was in. It seems that her goal was to make sure she" blamed K.T. for River Phoenix's injuries. After speaking with Detective Gisela Altamirano, however, Smith began to blame Dewitt, and then the family dog, for River Phoenix's condition. Grandy found River Phoenix nonresponsive with "bruises all over her body" consistent with physical abuse to her forehead, abdomen, arms, legs, and ears. LifeNet responder James Pappas testified "[t]here were various bruises of different sizes, shapes, locations, everywhere. The best way to describe it you couldn't take your hand and place it anywhere on that child that your hand

8

would not touch a bruise or more than one bruise."

Dewitt and Smith followed River Phoenix to the hospital. Doctors informed Altamirano they believed the child had undergone severe physical abuse. The couple was arrested, and Smith gave inconsistent recorded statements to police about the causes of River Phoenix's bruising and her death. River Phoenix's autopsy report confirmed "extensive blunt force trauma, abrasions, lacerations, and contusions over much of the body surface, including the head, the trunk, and all four extremities, widely scattered throughout the body," with the cause of death being blunt head trauma.

*(1)     The State's Nondisclosure of Certain Evidence Did Not Require an* in Camera *Inspection of the State's File or a Mistrial*

Smith contends that she made a plausible showing entitling her to an in camera inspection of the State's files by arguing the State violated the *Brady*[1] rule in failing to disclose Dewitt's statements made to Justice of the Peace Nancy Talley, his handwritten notes, and a DNA test result. In the same point of error,[2] she also maintains that she was entitled to a mistrial because of this nondisclosure.

---

[1]*Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[2]A multifarious issue is one that raises more than one specific ground of error. *In re S.K.A.*, 236 S.W.3d 875, 894 (Tex. App.—Texarkana 2007, pet. denied). We have repeatedly warned litigants to refrain from raising multifarious points of error. *See, e.g.*, *In re Guardianship of Moon*, 216 S.W.3d 506, 508 (Tex. App.—Texarkana 2007, no pet.); *Newby v. State*, 169 S.W.3d 413, 414 (Tex. App.—Texarkana 2005, pet. ref'd). Failure to heed our warnings runs the risk of having any multifarious issue(s) being summarily overruled. *Newby*, 169 S.W.3d at 414; *Harris v. State*, 133 S.W.3d 760, 764 n.3 (Tex. App.—Texarkana 2004, pet. ref'd); *Parra v. State*, 935 S.W.3d 862, 875 (Tex. App.—Texarkana 1996, pet. ref'd). In the interest of addressing substantive issues, we will not take the opportunity in this case to overrule this point of error on the basis of it being multifarious.

We overrule these assertions by Smith because (A) Smith discovered Talley's statements in time to effectively handle them at trial, (B) the trial court never ruled on whether the State's failure to timely disclose Dewitt's handwritten notes violated *Brady*, (C) no ruling was requested regarding the negative DNA test results, and (D) mistrial was not required in any case.

We first address the first three subpoints, all seeking to trigger an in camera inspection of the State's file.

The United States Supreme Court case of *Brady* established that nondisclosure of evidence violates due process rights of an accused where it is: (1) suppressed by the State after request for the evidence is made by the defense; (2) favorable to the defense; and (3) material to the outcome of the case. 373 U.S. at 87; *Thomas v. State*, 841 S.W.2d 399, 402–03 (Tex. Crim. App. 1992) (en banc) (citing *Moree v. Illinois*, 408 U.S. 786 (1972)).

"There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1976); *Menefee v. State*, 211 S.W.3d 893, 902 (Tex. App.—Texarkana 2006, pet. ref'd). "Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985). "In some situations where a defendant has failed to receive anything less than full disclosure under the *Brady* rule, he has a due process right to have the trial court examine the requested evidence in camera and then order disclosure of any appropriate information."

10

*Michaelwicz v. State*, 186 S.W.3d 601, 614 (Tex. App.—Austin 2006, pet. ref'd).

To be entitled to have the trial court review the State's file, however, Smith was required to "establish a basis for [her] claim that it contain[ed] material evidence." *Pennsylvania v. Ritchie*, 480 U.S. 39, 58, n.15 (1987) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (A defendant "must at least make some plausible showing of how their testimony would have been both material and favorable to [the] defense.")); *see Ransonette v. State*, 550 S.W.2d 36, 40 (Tex. Crim. App. 1976) ("we know of no constitutional obligation of the trial court to peruse the prosecutor's file for exculpatory evidence in the absence of a specific request supported by some showing that such evidence exists").

We review for abuse of discretion the issue of whether Smith made a sufficient showing to require an in camera inspection, while keeping in mind that the trial court is the sole judge of the credibility of the witnesses. *See Page v. State*, 7 S.W.3d 202, 207–08 (Tex. App.—Fort Worth 1999, pet. ref'd).

*(A)*      *Smith Discovered Talley's Statements in Time to Effectively Handle Them at Trial*

Talley testified Dewitt told her "that his girlfriend went to correct her and the little girl either clawed at her hand or bit at her hand or something to that effect, and she became upset. And when she became upset, he didn't like his girlfriend being upset and he totally lost it." "He also told me that he picked her up, and at some point when he let go of her, she—something about a coffee table."

11

After Talley was cross-examined, she was excused without objection.  Immediately after Talley was excused, Smith raised the issue of a *Brady* violation and argued Talley's testimony was exculpatory because Dewitt never indicated to Talley that Smith had any responsibility for River Phoenix's death.  The State responded that there were no written documents supporting Talley's testimony and alleged that Smith was in the room while Dewitt made the statements.

In ruling that failing to disclose Talley's testimony did not violate *Brady*, the trial court found Smith's counsel had discovered the substance of her testimony in sufficient time to prepare for trial.  This was demonstrated by the subpoena, directing Talley to appear and testify, issued at Smith's request made seven days before trial.  The trial court also found that Talley's testimony was not material.

It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment.  *Ritchie*, 480 U.S. at 57 (citing *Brady*, 373 U.S. at 87).  Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.*; *Thomas*, 841 S.W.2d at 404.  Because "the materiality issue turns on whether the defendant was prejudiced by delayed disclosure," "if the defendant actually knows the facts which are withheld, he is not entitled to relief based upon the State's failure to disclose the same facts."  *Williams v. State*, 995 S.W.2d 754, 761 (Tex. App.—San Antonio 1999, no pet.);

12

*State v. DeLeon*, 971 S.W.2d 701, 706 (Tex. App.—Amarillo 1998, pet. ref'd).[3]

As trier of fact, the trial court was free to believe Talley's testimony that Smith was present during Dewitt's statements and that counsel was aware of the substance of her testimony. It apparently so believed, since it ruled that there was no *Brady* violation with regard to Talley's testimony.

(B)     *The Trial Court Never Ruled on Whether the State's Failure to Timely Disclose Dewitt's Handwritten Notes Violated* Brady

During Dewitt's testimony at trial, Smith's attorney noticed Dewitt was holding handwritten notes, which reportedly were Dewitt's personal notes made shortly before trial. The State claimed it had received a copy of the notes the week before trial. The notes were made by Dewitt, contained a time line of events, the majority of the substance of Dewitt's testimony, and the following statements, among others, which could be viewed as exculpatory or impeachment evidence:[4]

> I had punched her and she fell on the floor backwards . . . . I had hit her over the
> head-strap part of my belt. Latoya said she was bleeding after that
> on the scalp . . . . I then put her on [the] crate by the nightstand. She was at the

---

[3]Further, "failure to request a continuance waives any *Brady* violation" and indicates the evidence was, in fact, not material. *Williams*, 995 S.W.2d at 761 (citing *Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. [Panel Op.] 1982)); *Yates v. State*, 941 S.W.2d 357, 364 (Tex. App.—Waco 1997, pet. ref'd). We note that counsel's request for continuance occurred after Talley was excused.
[4]Impeachment evidence "falls within the *Brady* rule." *Bagley*, 473 U.S. at 676.

13

edge. I then took my foot while lying down and nudged her to the middle where she fell and hit her head on the nightstand . . . . I got home at 9:26 p.m. to find River Phoenix in a full seizure at that time . . . . [Latoya] asked do you want to take her to the hospital . . . I saw the bruise on her mid section and said "F*** No." She had another real quick seizure and it stopped. She had opened her eyes and then she closed them and I thought she was asleep . . . I was assured by Latoya that she didn't hit her head . . . I had repeatedly pushed River Phoenix down and she would fall backwards and land on the purple rug and then made to get back up . . . I told Latoya I [threw] the belts out . . . I was going to get rid of the belts.

Smith's counsel moved for mistrial and argued that the State's failure to disclose this time line violated *Brady*. He also argued that failure to disclose the notes should be considered in determining whether the court should grant the in camera inspection. The State responded that, although the time line was received by the prosecutor's office, they were "never part of the file." Noting that it had previously ordered the State to disclose such information, the trial court arranged to have copies of the notes made, allowed the State to conclude its direct examination, and declared an overnight recess to give Smith's attorney "an opportunity to use it to prepare cross-examination of Mr. Dewitt." The motion for mistrial was denied.

The following morning, Smith's counsel moved for a seven-day continuance and complained that the notes "completely eviscerated my defense." Although the trial court decided the State suppressed favorable evidence in spite of a proper request by the defense, it found that the materiality of the notes had not yet been established and indicated it would carry the objection until the end of cross-examination.

For a complaint for appellate review to be preserved, the trial court must have "ruled on the

request, objection, or motion, either expressly or implicitly," or must have "refused to rule on the request" despite objection to the refusal to rule. TEX. R. APP. P. 33.1. Here, the record reveals that the trial court never ruled on the issue of whether the handwritten notes violated *Brady*. This was acknowledged by Smith in her brief.

  *(C) No Ruling Was Requested Regarding the Negative DNA Test Results*

  During a search of Smith's residence, officers located a broken broom. A test indicated there was blood on the broom, but a subsequent DNA test excluded River Phoenix as the source of the blood. Smith was provided a copy of the DNA results, and she introduced a copy of those results at trial. While complaining of untimely disclosure of the DNA results, Smith does not raise the issue of whether a *Brady* violation occurred with respect to the DNA test results. Since the State did disclose the test results, and no objection to the results was made, the trial court was free to determine that Smith's argument, raised during her motion for in camera inspection after introduction of the DNA test results, provided no plausible basis that the State's files would contain further undisclosed, material evidence.

  In sum, the trial court concluded that it "has no duty to do an in camera investigation," because no *Brady* violation occurred. Without a plausible showing that the State's file contained undisclosed material evidence, we conclude that the trial court did not abuse its discretion in failing to grant Smith's motion for an in camera inspection.

  *(D) Mistrial Was Not Required in any Case*

15

"Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Towery v. State*, 262 S.W.3d 586, 598 (Tex. App.—Texarkana 2008, pet. ref'd) (citing *Archie*, 221 S.W.3d at 699). We will uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie*, 221 S.W.3d at 699 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)).

Because the trial court could find the lack of incurable prejudice to Smith resulting from any of the above, we conclude it did not abuse its discretion in overruling Smith's motion for mistrial.

*(2)    No Confrontation Violation Arose from the Trial Court's Rulings Regarding the Testimony of Wade and Roberson*

Smith argues that the trial court violated the Confrontation Clause by limiting her cross-examination on the subject of Wade's and Roberson's participation in the Hell's Lovers biker group. We disagree.

*(A)    Wade's Testimony Was Not Limited by the Trial Court*

During Wade's cross-examination, the following exchange occurred:

Q.    Now, your mother is Evelyn Roberson?

A.    Yes . . . .

16

Q. And her husband is Nathaniel Roberson?

A. Yes.

Q. And he's a member of Hell's Lovers?

Mr. Shepherd: Your Honor, the State is going to object once again to the relevance of that.

THE COURT: Well, I'll allow that question.

Q. [Mr. Henry] He's a member of the Hell's Lovers?

A. Yes, sir.

Q. And your mother, is she property of the Hell's Lovers?

Mr. Shepherd: Once again, Judge, this is not relevant to the issue before this jury.

THE COURT: Well, the Court will sustain that, also the characterization.

A. At the time she was, yes.

Mr. Shepherd: You don't have to answer that.

A. Oh, okay.

[Defense Counsel]: Pass the witness, Your Honor.

Mr. Shepherd: Nothing further.

THE COURT: All right, you can step down.

In her brief, Smith complains that the trial court did not allow her to establish that Wade's mother

17

was "property" of the Hell's Lovers biker gang. Review of the record demonstrates that Wade provided the answer counsel sought, the answer was not struck, Smith's counsel passed the witness, and Smith did not attempt (and, thus, the trial court did not limit) further cross-examination.[5]

> *(B)    Limiting Roberson's Testimony Was Within the Trial Court's Discretion, Based on Its Lack of Relevance and the Failure to Show Roberson's Bias Against Smith*

The right to cross-examination extends to any matter that could reflect on the witness' credibility. *Virts v. State*, 739 S.W.2d 25, 28 (Tex. Crim. App. 1987). The right of an accused to cross-examine a testifying State's witness includes the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness' credibility. *Id*. at 29; *Alexander v. State*, 949 S.W.2d 772, 774 (Tex. App.—Dallas 1997, pet. ref'd). Thus, the scope of cross-examination should extend to all facts and circumstances that, when tested by human experience, tend to show that a witness may shade his or her testimony for the purpose of helping to establish only one side of the cause. *Carroll v. State*, 916 S.W.2d 494, 497–98 (Tex. Crim. App. 1996); *Alexander*, 949 S.W.2d at 774–75.

Although a defendant's right to confrontation and cross-examination is constitutionally safeguarded, the right is not absolute. *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); *Huff v. State*, 897 S.W.2d 829, 839 (Tex. App.—Dallas 1995, pet. ref'd). The trial court retains great

---

[5]The record demonstrates that Smith did not argue that she be allowed to continue questioning Wade about Hell's Lovers to examine possible bias. This argument was only offered in reference to Roberson's cross-examination.

latitude in imposing reasonable limitations on cross-examination. *Virts*, 739 S.W.2d at 28. The court may properly limit the scope of cross-examination to prevent harassment, prejudice, confusion of the issues, harm to the witness, and repetitive or marginally relevant interrogation. *Carroll*, 916 S.W.2d at 497. When considering whether a trial court's decision to exclude testimony is error, we must determine whether the trial court abused its discretion. *Love v. State*, 861 S.W.2d 899, 903 (Tex. Crim. App. 1993). This inquiry depends on the facts of each case. *Id.* at 904.

During Roberson's cross-examination, Smith requested the trial court's permission to inquire about her participation in Hell's Lovers. Smith argued the evidence was relevant for the purpose of demonstrating bias toward Dewitt. "[T]he right to cross-examination includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Ritchie*, 480 U.S. at 51–52. However, the court reminded counsel that Roberson testified against both Dewitt and Smith. It stated, "Well, I think that you can go into the fact that her husband and Dewitt are friends. I think that you can go into the fact—you can ask whether or not due to that friendship would she have a tendency to testify as to—based on that relationship."

A proffer outside the jury's presence produced the following testimony:

Q. And Mr. Nathaniel Roberson is a member of the Hell's Lovers motorcycle gang?

A. That is not correct. He's a member of the Hell's Lovers motorcycle club. It is not a gang.

19

Q.     Okay. And the Hell's Lovers motorcycle club, what exactly is that?

A.     It's an organization.   They ride motorcycles, and they're located in a lot of different states . . . .

Q.     . . . were you property of the Hell's Lovers motorcycle organization?

A.     Sir, I am not a member of the Hell's Lovers organization.

Counsel did not question Roberson on the subject of bias.   Here, the trial court concluded that testimony regarding participation in Hell's Lovers, absent evidence of bias, was irrelevant to the issue of whether Smith intentionally or knowingly caused River Phoenix's death.   Because there was no error in that finding, there was no violation of the Confrontation Clause.

*(3)     Admitting River Phoenix's Autopsy Report Did Not Violate the Confrontation Clause*

Smith contends that the autopsy report constituted testimonial hearsay and that its admission violated her Sixth Amendment right to confront witnesses against her.   We disagree.

We review a trial court's decision to admit evidence under an abuse of discretion standard. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).   "Although we defer to a trial court's determination of historical facts and credibility, we review a constitutional legal ruling . . . de novo."   *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).   A trial court's ruling to admit evidence will not be reversed as long as it falls within the zone of reasonable disagreement. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex . Crim. App. 1990) (op. on reh'g).

"[I]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with

20

the witnesses against him." U.S. CONST. amend. VI. The admission of a testimonial, out-of-court statement from a declarant who does not appear at trial violates the Confrontation Clause unless the declarant was unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. *Davis v. Washington*, 547 U.S. 813, 821 (2006); *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

In this case, the autopsy report was admitted into evidence during the direct examination of the medical examiner who performed the autopsy. Because the testifying medical examiner was available for cross-examination, there was no Confrontation Clause violation. *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2531 (2009); *Crawford*, 541 U.S. at 53–54; *see Briggs v. State*, 789 S.W.2d 918 (Tex. Crim. App. 1990). Thus, the trial court did not abuse its discretion in admitting the autopsy report.

*(4)* *Excluding Evidence of Smith's Mental-Health History from the Guilt/Innocence Phase Was Not Error*

During Altamirano's cross-examination, Smith attempted to offer emergency room medical records indicating she was suffering from "depression thoughts of suicide" in July 2007. The medical records referred to a previous suicide attempt, ingestion of Valium, and references that Smith had not been taking her anxiety and depression medication. Smith argues that exclusion of this evidence, relevant to her capacity to formulate the requisite mens rea, was an abuse of the trial court's discretion.[6] *See Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App.

---

[6]In support of her position, Smith cites the Court to cases discussing the affirmative defense of insanity.

21

2007).

Texas does not recognize diminished capacity as an affirmative defense. *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008); *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005); *see Rhoten v. State*, 299 S.W.3d 349 (Tex. App.—Texarkana 2009, no pet.). Rather, it is a "failure-of-proof defense in which the defendant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense." *Jackson*, 160 S.W.3d at 573–74; *Ruffin*, 270 S.W.3d at 593.[7] To be admissible in tending to disprove state of mind, the evidence in this case must have shown that Smith, due to her mental condition, was either unable to form a conscious objective or desire or to engage in conduct causing River Phoenix's death, or could not be aware her actions were reasonably certain to cause River Phoenix's death. *See Jackson*, 160 S.W.3d at 574; *Thomas v. State*, 886 S.W.2d 388, 391 (Tex. App.—Houston [1st Dist.] 1994, writ ref'd).

The trial court expressed "there is no direct evidence that's been presented to suggest that the hospitalization on I believe July 11, 2007 has any relevance as to her state of mind because there's no direct evidence that she did not have . . . the requisite state of mind to form intent to commit the offense in question." The court determined that, without such a showing, this evidence could only be considered in mitigation.

---

[7]A trial judge has discretion to determine whether evidence regarding state of mind would support a lesser-included offense, and the evidence can be presented during punishment in order to reduce the sentence assessed by the jury. *Jackson*, 160 S.W.3d at 574.

As further support, Smith cited Article 38.36(a) of the Texas Code of Criminal Procedure, which provides:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (Vernon 2005). Smith's medical records indicate that her treatment plan included medications to treat anxiety and depression and that she was discharged after an appointment was set up for her at a local behavior treatment facility.[8] There was no evidence presented that Smith was not taking her medication and following her treatment plan at the time of the offense. As the court pointed out, the record does not demonstrate that Smith's state of mind during the July incident, which occurred while she was off of her prescribed medication, was her state of mind at the time of the offense in September.

Because Smith did not present any evidence that she was unable to form the requisite intent due to her depression and thoughts of suicide, the medical records were not admissible as tending

---

[8]The additional 1,560 pages of medical records spanning several years, which Smith sought to introduce, covered mostly irrelevant checkups and hospital appointments, including physical diagnoses of tuberculosis, scoliosis, and resulting surgeries and back pain. Smith also sought to introduce Illinois Children and Family Services Department records, which may have provided insight into her home life as a child. We assume these records were introduced because some make references to a past medical history of depression and anxiety. However, a majority are simply irrelevant. Trial counsel did not point to the page numbers which supported his position that the records should be introduced, either to the trial court or in his brief. A trial court need not sort through challenged evidence in order to segregate admissible evidence from excludable evidence. *Jones v. State*, 843 S.W.2d 487, 492 (Tex. Crim. App. 1992); *see In re S.M.*, 207 S.W.3d 421, 424 (Tex. App.—Fort Worth 2006, pet. denied) (error not preserved where trial court required to sort through admissible and inadmissible evidence). In any event, there were no medical records provided for our review after July 2007.

23

to disprove her state of mind. *See Jackson*, 160 S.W.3d at 574; *Thomas*, 886 S.W.2d at 391. Thus, the trial court did not abuse its discretion in failing to admit the records during the guilt/innocence phase.

*(5)* *Admitting Evidence of Smith's Prior Behavior and Attitude Toward River Phoenix Was Not Error*

Smith complains that introduction of Wade's and Roberson's testimony regarding Smith's demeanor toward River Phoenix amounted to impermissible extraneous-offense evidence. She argues that the trial court erred in allowing the testimony over her Texas Rules of Evidence 401, 403, and 404 objections.

A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). The interaction between several statutes governs the analysis in this case. First, if evidence is not relevant to a fact of consequence in the case, it may not be admitted. TEX. R. EVID. 401. "In all prosecutions for murder, the state . . . shall be permitted to offer testimony as to all relevant facts and circumstances surrounding . . . the previous relationship existing between the accused and the deceased." TEX. CODE CRIM. PROC. ANN. art. 38.36(a). This article is read in conjunction with Rule 404(b). *Smith v. State*, 5 S.W.3d 673, 677–78 (Tex. Crim. App. 1999). While evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith," they may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

24

accident." TEX. R. EVID. 404(b). "Rule 404(b) is a rule of inclusion rather than exclusion." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "[I]f evidence (1) is introduced for a purpose other than character conformity; (2) has relevance to a 'fact of consequence' in the case, and; (3) remains free of any other constitutional or statutory prohibitions, it is admissible." *Segundo v. State*, 270 S.W.3d 79, 88 n.19 (Tex. Crim. App. 2008) (quoting *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)). If evidence is admissible under the above rules, it may still be excluded under Rule 403 if the probative value of the evidence is substantially outweighed by unfair prejudice. TEX. R. EVID. 403. Whether extraneous-offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

Here, Smith's intent is a fact of consequence in this case. Wade's and Roberson's testimony regarding Smith's previous actions are facts that have a tendency to make probable the State's theory that Smith possessed the requisite intent at the time of the offense. Also, in a murder case, the relationship between an accused and the victim is "itself a material issue." *Garcia v. State*, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006). The evidence was admissible under Rule 401. Next, evidence of Smith's prior assault and interactions with River Phoenix are also admissible as a demonstration of their relationship under Article 38.36. *Id.* at 704; *Baker v. State*, 368 S.W.2d 627, 632 (Tex. Crim. App. 1963) (finding prior assault on deceased six years ago not too remote, thus admissible under prior version of Article 38.36).

25

Although Wade and Roberson testified about prior bad acts, the State argued their testimony was being offered only to demonstrate intent and absence of mistake or accident, and the trial court issued a limiting instruction to the jury to that effect. Specifically, the trial court instructed the jury it could not consider the testimony "to prove the character of the Defendant in order to show that she acted in conformity therewith on the occasion in question." "Evidence of prior extraneous offenses committed by the accused against the victim of the offense charged that show ill will or hostility toward the victim 'is admissible as part of the State's case in chief as circumstantial evidence of the existence of a motive for committing the offense charged.'" *Page v. State*, 819 S.W.2d 883, 887 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd) (quoting *Foy v. State*, 593 S.W.2d 707, 709 (Tex. Crim. App. [Panel Op.] 1980)); *see Bush v. State*, 958 S.W.2d 503, 505–06 (Tex. App.—Fort Worth 1997, no pet.) (prior instances of violence toward murder victim admissible). Thus, although extraneous, the evidence was admissible under the exceptions listed under Rule 404(b). *Garcia*, 201 S.W.3d at 704 (evidence of prior bad act against victim "is admissible under Rule 404(b) for the purpose of illustrating the nature of" the relationship between accused and victim).

Because Wade's and Roberson's testimony was introduced for a purpose other than character conformity, had relevance to intent, absence of mistake, and the nature of the relationship between Smith and River Phoenix, and remained free of any other constitutional or statutory prohibitions, it was admissible. *Rankin*, 974 S.W.2d at 709. Thus, we move to the

question of whether the probative value of their testimony was substantially outweighed by unfair prejudice. TEX. R. EVID. 403; *Garcia*, 201 S.W.3d at 704. It is Smith's burden to establish exclusion under this rule. *Montgomery*, 810 S.W.2d at 389.

The first factor we analyze in determining whether the prejudice of an extraneous offense substantially outweighs its probative value is "how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense." *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (citing *Montgomery*, 810 S.W.2d at 389–90). As discussed above, Wade's and Roberson's statements compellingly made the allegation that Smith possessed the requisite murderous intent more probable. This factor favors admission of their testimony.

The second factor concerns the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way." *Santellan*, 939 S.W.2d at 169 (citing *Montgomery*, 810 S.W.2d at 389–90). There is nothing in the record to indicate Smith's prior bad acts would "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged" in this murder case, especially given the trial court's lengthy Rule 403 limiting instruction. *Old Chief v. United States*, 519 U.S. 172, 180 (1997). This factor also favors admission.

The third factor looks to "the time the proponent will need to develop the evidence, during

27

which the jury will be distracted from consideration of the indicted offense." *Santellan*, 939 S.W.2d at 169 (citing *Montgomery*, 810 S.W.2d at 389–90). The State presented a total of eleven witnesses. Wade's and Roberson's testimony regarding the extraneous acts comprised a small portion of the record. Therefore, we conclude this factor also weighed in favor of admitting their testimony.

The last factor involves the "force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute." The State's need for Wade's and Roberson's testimony was required to rebut the defensive theory that only Dewitt was responsible for River Phoenix's death. Although Dewitt and K.T. testified to actions conducted by Smith leading up to River Phoenix's death, the jury may have decided Dewitt's testimony was less credible due to a deal with prosecutors that he would not receive the death penalty if he testified against Smith. The jury could also believe that K.T.'s testimony was biased toward her father, especially since she did not witness the beatings which occurred on the day before River Phoenix's death, either because she was in school or because the beatings occurred after her bedtime. Moreover, testimony of witnesses outside of the home could lend more credibility to Dewitt's and K.T.'s testimony. Thus, we find that the final factor also weighs in favor of admission and that the trial court did not err in concluding the probative value of Wade's and Roberson's testimony was not substantially outweighed by unfair prejudice.

28

Finding no error in admission of Wade's and Roberson's testimony to demonstrate Smith's relationship with River Phoenix and intent to cause her death, we overrule this point of error.

We affirm the judgment of the trial court.


                                        Josh R. Morriss, III
                                        Chief Justice

Date Submitted:     May 10, 2010
Date Decided:       June 2, 2010

Publish