

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-11-00235-CR
_____

DUSTY S. LICON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 4th Judicial District Court
Rusk County, Texas
Trial Court No. CR11-096

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

It was just after 5:00 a.m., a couple of days before Christmas 2010, when a nightgowned Tammie Evans was startled to see neighbor and acquaintance Dusty S. Licon standing in her bedroom. As a result of this early morning event—and Evans' later discovery that some money was missing from her purse—a jury convicted Licon of burglary of a habitation.[1] On appeal, Licon urges three evidence-related issues. We affirm because (1) legally sufficient evidence supports Licon's conviction, (2) no *Brady*[2] violation was preserved, and (3) admitting Ron Martin's testimony was not error.

*(1)     Legally Sufficient Evidence Supports Licon's Conviction*

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (4–1–4 decision) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

---

[1]Licon's sentence was seven years' confinement.

[2]*Brady v. Maryland*, 373 U.S. 83 (1963).

2

facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* The indictment alleged Licon "intentionally and knowingly enter[ed] a habitation without the effective consent of Tammie Evans, the owner thereof, and with intent to commit the offense of Theft." Thus, the hypothetically correct jury charge authorized the jury to find Licon guilty of the offense of burglary of a habitation if he (1) intentionally and knowingly (2) entered Evans' habitation without her consent (3) with the intent to commit theft. TEX. PENAL CODE ANN. § 30.02(a)(3) (West 2011), § 31.03 (West Supp. 2011).

Evans had locked all of the doors to her home before attending a Christmas party at her church the evening of December 22, 2010. She returned home "around midnight," placed her purse in the kitchen cabinet, and went to sleep alone.[3] Around 5:00 a.m., Evans awoke to turn off the alarm clock and "just fe[lt] the presence of someone" behind her. Evans testified she "turned around, and because I had left the light on in the kitchen, I could make out that it was just a larger, stout person. And when I turned, it was Dusty Licon." Evans had grown up

---

[3]Evans' husband, Andy, and her oldest son were out of town while her youngest child was spending the night with his grandparents.

knowing the Licon family, and Licon's father and stepmother owned a home which shared a common back yard to Evans' home.

Licon called her name, and Evans "sternly" instructed him to "[g]o in the living room." Evans quickly retrieved a robe and "continued into the bathroom" to compose herself in the wake of a "most paralyzing fear." She exited the bathroom, "walked out of the bedroom," and saw Licon in the kitchen "just pacing back and forth, back and forth, like some crazy person." He was drinking a Red Bull energy drink, which she thought was one of hers, and Evans noticed another empty Red Bull can in the room. Evans approached Licon, who "proceed[ed] to tell me how pretty my hair looks and how beautiful I am at 5:00 in the morning," making Evans "[v]ery uncomfortable." Evans testified that Licon

> sits down, and then he proceeds to tell me that his stepmom, Lisa, is nothing but a "F-ing B," and I try to—when he starts talking about her, then that just angers him and makes him even madder. And I tell him that I'm sorry that he had problems with her and problems with his family, but—you know, I tried to change the subject, because he's getting irritated and even madder. And then he tells me that he's been exiled from Anahuac, he's been exiled from Baytown, and he has no job, that he wants to get his wife and his baby and his life back together.
>
> And I try to sympathize with him, just kind of like you would, I guess, if you were in a hostage situation. . . . He tells me that he's been in my house, that he knows that my husband's not home, that he knows that my boys are not home, and that he's a lonely man, and that he has wants and he has needs. And that he kind of thought that maybe he and I could—and gestures that maybe we would do something. And I said, "No, I am a very happily married woman, and that is not going to happen."

Evans offered Licon the option to stay in her home while she went to her mother-in-law's home. She retrieved her purse and realized there was no cash in her wallet—she expected to find the "Christmas money" that her parents had given her and that she had placed in her wallet shortly

4

before Licon's visit. At this point, Licon became nervous, stood up, said, "[P]lease don't tell anybody that I was at your house. I'm sorry," and left through the back door. As soon as Licon was gone, Evans ran to her car in her nightgown and robe and drove to her friends' house "out at Lake Cherokee."

Evans arrived at Tracy and Randy Whitley's house crying and upset. After calming down some, she called her brother, who was a sergeant with the Texas Department of Public Safety. He advised her to fill out a police report. Tracy accompanied Evans in her vehicle, and Randy followed the pair in his truck, so Evans could safely stop at her home to change before going to the police station. Evans met with Officer Ron Martin at city hall, but was "too upset there to write" her statement. Martin "noticed right off that something was wrong. She seems to be very nervous, seems to be—to have maybe been crying. Very upset. . . . had a little shake, a little quiver to her voice when she was speaking to me." Martin told Evans she could go home and write the statement.

After leaving the police station, Evans noticed that someone—she concluded the culprit was Licon—had "broken a console in my car," "broken the glove box in my car," dumped her makeup bag in the back seat, and strewn Christmas cards "all over the backseat [sic]." Evans spotted Licon driving back to his stepmother's home, and a "rage and anger" came over her, prompting her to call Martin so they could confront Licon together. Martin testified concerning that confrontation:

> Mrs. Evans is asking him why, why he came into her residence. And his reasoning was that he didn't have a place to sleep, that he was locked out for some reason, maybe couldn't get into the residence. He was tired. He was

5

hungry. And that was his reasoning. And he pretty much had his head down, and she was scolding him pretty good about coming to the residence . . . so he admitted he had come into the residence.

Martin and Evans did not see Licon with any money, and Evans did not see him break into her car. There were no signs of forced entry, and no property belonging to Evans was recovered from Licon. However, although Evans had known Licon "probably his whole life," and Licon had been in her home with her permission in the past, Evans testified Licon did not have permission either to be in her home on the night of the incident or to drink her Red Bull. She believed Licon stole the money that was in her purse and "went and bought drugs with it." The jury could have concluded from the evidence first that Licon stole the Red Bull and/or the money from Evans' purse and also that Licon entered Evans' house with intent to commit that theft.

At trial, while Licon acknowledged that he intentionally and knowingly entered Evans' habitation—his defense was that he was tired, cold, and hungry. He argued that Evans was a neighbor and friend and that he did not have the intent to commit theft. The jury is the exclusive judge of the credibility of witnesses and the weight of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The jury was entitled to reject Licon's defense and believe Evans' testimony that she did not consent to Evans' early morning unannounced entry into her home or his consumption of her Red Bull.

Also, we must determine "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper*, 214 S.W.3d at 16–17. In viewing the record, direct and circumstantial

6

evidence are treated equally. *Isassi*, 330 S.W.3d at 638. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 12. Here, the jury was also free to believe Evans' testimony that her purse contained $120.00 when she placed it in the kitchen cabinet, could have reasonably deduced that the disappearance of the cash was caused by Licon, since he was the only other person in the home, and could have reached the ultimate conclusion that that was the reason he entered her house. The evidence is legally sufficient to sustain Licon's conviction.

*(2)      No Brady Violation Was Preserved*

In an amended motion for new trial, Licon argued that the State failed to disclose the names of witnesses "with knowledge of exculpatory and/or mitigating evidence."[4] The trial court denied the amended motion for new trial December 5, 2011. On appeal, Licon argues that the State's failure to disclose the identity of the Whitleys constituted a *Brady* violation.

At a hearing on the amended motion for new trial, Thad Davidson, Licon's "court-appointed trial lawyer" testified that he was "99.9% sure" that the identities of the Whitleys or the fact that Evans went to their home were not disclosed to him. He first heard about the Whitleys in trial.[5]

---

[4]Licon's first motion for new trial, filed October 25, 2011, failed to raise this issue.

[5]Randy did not testify at the hearing. Tracy testified that a "[h]ysterical," incomprehensible Evans arrived at her home early on the morning of the incident dressed in her bathrobe. When Tracy "opened the door, [Evans] just fell into [her] arms weeping" and informed Tracy that Licon had been in her house. Martin testified that the Whitleys "didn't know nothing about" the incident. Tracy was asked whether Evans told her "where she first saw him," to which Tracy replied, "[i]n the doorway of her room, her bedroom." "She told me there was someone in her room," but she could not remember if he was standing over her bed. Evans told Tracy "she [was] missing money in her

7

When evidence withheld in violation of *Brady* is disclosed at trial, the defendant's "failure to request a continuance waives any *Brady* violation, as well as any violation of a discovery order." *Taylor v. State*, 93 S.W.3d 487, 502 (Tex. App.—Texarkana 2002, pet. ref'd); *see Smith v. State*, 314 S.W.3d 576, 585 n.3 (Tex. App.—Texarkana 2010, no pet.); *Jones v. State*, 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.).

A review of the record reveals that Evans testified about the Whitleys and that Davidson learned about them at trial, but failed to request a continuance after his discovery. Acknowledging this failure to request a continuance, Licon's brief offers this excuse:

> Evans['] testimony does not get into some of the important facts of that visit. No inconsistent statement comes from her trial testimony, and there was no evidence to suggest that the Whitleys might throw a different light on the case.[6] Moreover, the trial and the evidence were too far gone. The State had already elicited its evidence from Ms. Evans; the essential evidence of the trial was, for the State, complete. Voir dire was long over. Opening statements had been given. Trial strategy had been outlined. Appellant was definitely at a disadvantage in terms of trial preparation and strategy. From the very start, from voir dire onwards—had he known of the Whitleys, of the inconsistency, of the delay—Appellant's trial counsel could very understandably have placed before the jury a different take on the case: Ms. Evans' delay in reporting the incident, consulting with others, her inconsistent statement—all of this points to a victim whose credibility is undermined by her actions subsequent to the incident.

We conclude that counsel's failure to request a continuance, so he could determine the substance of the Whitleys' knowledge about the case to potentially present the arguments made in his brief

---

wallet." She was there at the police station when Evans reported to Martin. She did not hear from anyone in the district attorney's office before the trial.

[6]While counsel claims a *Brady* violation in lack of disclosure of the Whitleys, counsel's admission that no evidence suggests "the Whitleys might throw a different light on the case" is consistent with our inability to find anything in the record other than speculation that the Whitleys might have offered exculpatory material that might benefit Licon.

8

to the jury, waived any alleged *Brady* violation. *Smith*, 314 S.W.3d at 585 n.3 (failure to seek continuance waives *Brady* violation, indicates evidence not material).

We overrule this point of error.[7]

*(3)      Admitting Martin's Testimony Was Not Error*

We review the trial court's decision to admit evidence under an abuse-of-discretion standard. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). "A trial court does not abuse its discretion if the decision to admit evidence is within the 'zone of reasonable disagreement.'" *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). "If the trial court's decision on the admission of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed." *Id.* (citing *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App.

---

[7]Under *Brady*, to ensure the accused a fair trial, a prosecutor has an affirmative duty under the Due Process Clause of the Fourteenth Amendment to disclose to the accused all exculpatory or impeachment evidence, regardless of the good faith or bad faith of the prosecution, which is favorable to the defendant and is material to either guilt or punishment. 373 U.S. at 87. A due process violation occurs if (1) the prosecutor fails to disclose evidence that is (2) favorable to the defendant and (3) material. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); *Franks v. State*, 90 S.W.3d 771, 796 (Tex. App.—Fort Worth 2002, no pet.). Evidence is material if there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). Under *Brady*, the defendant bears the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure. *Id.* The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. *Id.* Davidson testified that he would have subpoenaed the Whitleys if he had known about them to help explain the gap in time between when Evans left her home and when she met Martin. "The only thing that stuck out was Tracy said that Dusty was standing over the bed when Tammie awoke." Davidson described this as "contradictory in some regards" to what Evans testified to at trial. However, David testified he did not know whether this evidence would have changed the outcome of the trial.

2002); *Montgomery*, 810 S.W.2d at 379).  We will not substitute our own decision for that of the trial court.  *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

After describing Evans' appearance, Martin was questioned in a way that suggested counsel was seeking to establish the excited-utterance hearsay exception.  The following discussion ensued after Martin was asked to relate statements Evans made to him:

> [Defense Attorney]:  Your Honor, I believe -- I have to make an objection.  I believe that this witness is about to engage in hearsay testimony about what someone else said to him.

> [State's Attorney]:  Your Honor, I believe we've laid a proper predicate that it's an obviously excited utterance.  He's described how she was shaking and upset, and we believe that's an appropriate excited utterance.

> THE COURT:  I'll overrule the objection and give you a running objection to this line of testimony.

> [Defense Attorney]:  Thank you, Your Honor.  And again, let me lay some more grounds there, Your Honor, if I may, for my objection.  I believe that if this witness is going to engage in hearsay evidence about what the alleged victim in this case said to him, then I believe that would be a violation of my client's Sixth Amendment right to confront on that issue.  I believe that would be under the Sixth Amendment of the United States Constitution, as well as Article 1, Section 10, of the Texas Constitution.

> [State's Attorney]:  Your Honor, my response would be he's already confronted that witness that's relating these events to the police chief.  I would also submit that this is not so much offered for the truth of the matter asserted but as to whether she made the report and what the report was, and it's necessary to explain what the chief does in response.  It's the information he's acting on.  And if that's necessary, we would limit the offer to such purpose.

> [Defense Attorney]:  And, Your Honor, I have no objection to the chief of police testifying about what he saw or what his impression was or what he did.  I don't have a problem with any of that.  What I do have a problem with is him testifying about what somebody else said to the alleged victim, when that could have been brought out by the State.  It was not.  So I believe that would be a

10

violation of *Crawford*, and I believe under the Sixth Amendment and Article 1, Section 10, that it would be inadmissible.

THE COURT: All right. I'll overrule the objection. Ladies and gentlemen, you may not consider the statements made by this witness as to what he was told for the truth of the matter is -- or what the truth of the matter contained within the statements are, but what the chief relied upon in any further actions.

Martin then testified that Evans reported "my neighbor's son, Dusty Licon, . . . was in my house." Evans recounted the incident for Martin, expressed her belief that $120.00 was taken from her purse, and stated that her car had been broken into. Licon contends the trial court erred in admitting Martin's testimony under the excited-utterance exception to the hearsay rule.

The record demonstrates that Martin's testimony was not admitted under the excited-utterance exception. Although a police officer's testimony may be inadmissible due to hearsay, an officer may describe statements made by others for the purpose of showing why the defendant became a suspect and to explain the events and circumstances leading to the defendant's arrest. *See Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *Lacaze v. State*, 346 S.W.3d 113, 121 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). This is because "[a]n extrajudicial statement . . . which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Dinkins*, 894 S.W.2d at 347. Here, the jury was instructed not to consider Martin's testimony about statements made to him for the truth of the matter asserted. On appeal, we presume that the jury followed the trial court's instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *see Lacaze*, 346 S.W.3d at 121–22 (where trial court instructs jury not to consider testimony for truth of matter

11

asserted, "any error with respect to the hearsay instruction has not been preserved for our review in the absence of an appellant's request for a different instruction in the trial court"). Therefore, we cannot find the admission of Martin's statements constituted an abuse of discretion.[8]  *See Jones v. State*, 843 S.W.2d 487, 499 (Tex. Crim. App. 1992), *overruled on other grounds by Maxwell v. State*, 48 S.W.3d 196 (Tex. Crim. App. 2001) (police officer's repetition of out-of-court statements made by witness which implicated defendant not inadmissible hearsay because they were not offered for truth of matter asserted, but rather to explain how defendant came to be suspect); *see also Davis v. State*, 169 S.W.3d 673, 676 (Tex. App.—Fort Worth 2005, no pet.); *Schneider v. State*, 951 S.W.2d 856, 863–64 (Tex. App.—Texarkana 1997, pet. ref'd).

Moreover, Licon is unable to demonstrate harm. Substantial rights are not affected by the erroneous admission or exclusion of evidence, "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (footnotes omitted).  If the evidence is generally cumulative of other evidence introduced in the case, no harm attaches. *See Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) (to show harm, excluded evidence must be controlling on material issue and not cumulative of other evidence).  Here, Martin's testimony was generally cumulative of Evans' testimony.

This point of error is overruled.

---

[8] The trial court could have also reasonably concluded that Licon had sufficient opportunity to confront Evans directly and that, thus, there was no Confrontation-Clause violation in the admission of this evidence.

12

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted: May 29, 2012
Date Decided: June 1, 2012

Do Not Publish