IN THE
TENTH COURT OF APPEALS
No. 10-11-00283-CR


JOHNATHON GREGORY FUTCH,

Appellant

 v.

THE STATE OF TEXAS,

Appellee

From the 19th District Court
McLennan County, Texas
Trial Court No. 2011-645-C1

## MEMORANDUM OPINION

A jury convicted Appellant Johnathon Gregory Futch of the state-jail-felony offense of forgery, and the trial court assessed his punishment at twenty-four months' confinement in state jail. This appeal ensued.

### Sufficiency of the Evidence

In his first issue, Futch contends that the evidence is legally insufficient to support his conviction for forgery because the State failed to prove beyond a reasonable doubt that David Eugene Nemmer, Jr. did not authorize him to sign Nemmer's name on

the check in question.  Similarly, in his second issue, Futch contends that the trial court erred in denying his second motion for directed verdict, which is also a challenge to the sufficiency of the evidence to support the conviction.  *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."  *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011), *cert. denied*, 132 S.Ct. 2712 (2012).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted.  *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).  And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.  *Jackson*, 443 U.S. at 326.  Further, direct and circumstantial evidence are treated equally:  "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial

evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

A person commits the offense of forgery if he "forges a writing with intent to defraud or harm another." TEX. PENAL CODE ANN. § 32.21(b) (West 2011). As limited by the indictment, "forge" means: "(A) to . . . make, complete, execute, or authenticate any writing so that it purports . . . to be the act of another who did not authorize that act"; or "(B) to . . . transfer . . . [or] pass . . . a writing that is forged within the meaning of Paragraph (A)." *Id.* § 32.21(a)(1). The offense is a state jail felony if the writing is or purports to be a check. *Id.* § 32.21(d).

The evidence presented in this case is as follows: Terri Stepan, an Asset Protection Associate for the Wal-Mart in Bellmead, testified that on the night of January 25, 2011, she sensed something was "off" when she observed a woman in the ladies' clothing department rapidly selecting lots of clothing without looking at the prices and putting the clothing into her basket. Stepan began to follow the woman. The woman met up with two men, one of whom Stepan later identified as Futch. The men had a hodgepodge of things and were suspicious. The group then went to check out. The unidentified man presented a check to the cashier, and the check was denied.

Stepan then testified that on the next night, January 26, 2011, she was walking the sales floor looking for suspicious activity when she recognized Futch and the woman from the night before. Stepan went to the office to observe them on the surveillance

cameras. As she watched them shop, Stepan called and asked if the police department would send over a police officer in case she needed help. When Futch and his companion were attempting to check out, Stepan observed Futch take out and sign a check. Stepan had called the Customer Service Manager Gloria Perez and asked her to double-check the ID and make sure everything was legitimate with the transaction. Stepan could tell from the surveillance video that Futch was asked for an ID. Futch appeared to be looking for his ID and then walked away.

Stepan testified that as Futch was exiting the store, she came out of her office and met him with two Bellmead police officers. She told Futch that she was with Wal-Mart Loss Prevention and that she needed to talk to him. They brought Futch back into the office, and then Stepan retrieved the check Futch had presented at the register. The imprinted name on the check was David Eugene Nemmer, Jr. and was signed "David Nemmer." Stepan asked Perez what had happened, and Perez said that when asked for an ID, Futch said that he had to go get his ID from his car. On cross-examination, Stepan acknowledged that she did not know whether David Nemmer gave Futch permission to sign his name to the check.

Perez then testified that Stepan called her on January 26, 2011, and told her to make sure that the cashier asked for an ID from Futch. When Futch was asked for an ID, he said that he had to go out to the car in the parking lot to get his ID. Perez stated that this happens often and that the people usually do not come back. On cross-examination, she, like Stepan, acknowledged that she had no way of knowing whether David Nemmer authorized his signature on the check.

Linda Vaughn, the Branch Manager of Fidelity Bank of Texas in Robinson, then testified that she checked on the account open for David Eugene Nemmer. There had been no activity in the account since 2009, there was less than $2 in the account, and there was no one else listed on the account who could write checks. When asked on cross-examination if there was anything in the bank's records that indicated that David Nemmer did not allow Futch to put his name on the check, she replied that the signature card in the records, which is the bank's legal agreement with the customer, only had Mr. Nemmer's name on it but that there was nothing in the file that said that Futch could not put Nemmer's name on the check with Nemmer's permission. Vaughn further explained, however, that she had been in the banking business for twenty-one years at the time of trial and that it was an oddity for someone to have a bank account for which they authorized someone else to sign his or her name to a check.

Bellmead Police Officer Aaron Burns then testified that on January 26, 2011, he responded to a call regarding a possible forgery at the Bellmead Wal-Mart. When he arrived, he joined Stepan where she was watching the surveillance cameras. Stepan explained to him what had happened the night before and told him that she believed the two individuals she was watching on the camera were in the process of committing a forgery. As Burns watched, he saw Futch sign a check and present it to the cashier. Futch then left, which, according to Burns, is usually a common indictor that an individual is trying to flee the scene because he feels that he has been caught in the process of passing a bad check. Burns and Stepan stopped Futch as he walked out of the store and told him that they needed him to come and answer some questions. Futch

seemed nervous and a little bit surprised, but he agreed to go with them. Officer Kory Martin arrived at that time.

Burns testified that when the officers discovered that Futch's name was not the name on the check, they asked him about it. Futch said that the check belonged to one of his friends and that his friend had given him permission to come to Wal-Mart and purchase whatever he wanted. The officers asked Futch for Nemmer's contact information. Futch gave Martin three telephone numbers, but Martin was unable to contact Nemmer using any of the numbers. Futch also said that Nemmer was in Robinson, that he had just seen him that night, that he had just left the house, and that Nemmer had given him permission to use the check, but Futch did not give the officers an actual physical address. Burns noted that Nemmer has never come to the police department and said that he gave Futch permission to use his checks.

Burns testified that they gave Futch his Miranda warnings and that Futch agreed to continue talking to them. Futch had previously told them that he drove his own vehicle to the store, so the officers asked for Futch's consent to search the vehicle. Futch gave his consent, and the officers searched the vehicle. They found Futch's wallet in the car. In the wallet, they found a Texas driver's license belonging to a Richard Kent Smith and a debit or credit card for First National Bank of Texas belonging to a Richard Smith. The officers also found in Futch's wallet a check from Bank of America that had been altered such that it appeared to belong to Richard Smith. The officers searched Futch's person. On his person, they found a leather checkbook. The checks in the checkbook matched the Nemmer check that Futch had attempted to pay with that night. Futch had

attempted to pass check number 1121, and the next check in the checkbook was 1122.

Futch argues that the foregoing evidence is insufficient to support his conviction because the burden was on the State to prove beyond a reasonable doubt Nemmer's state of mind (*i.e.*, that Futch had Nemmer's authorization), and, to suggest that a rational jury could make such an inference from the circumstantial evidence of Futch's acts (*i.e.*, Futch's possession of items belonging to Richard Smith, Futch's statement that his ID was in his vehicle, and his statement to the arresting officer that Nemmer gave him permission to affix his signature to the check) is "outside the realm of reasonableness." We conclude, however, that the evidence is sufficient.

The record includes probative circumstantial evidence other than Futch's acts as stated above on the issue of whether Nemmer authorized Futch's signing of Nemmer's name to the check in question. For instance, Vaughn, the branch manager for the bank that held Nemmer's account, testified that there had been no activity in Nemmer's account since 2009, that there was less than $2 in the account, that there was no one else listed on the account who could write checks, and that it was an oddity for the bank's customers to authorize others to sign their checks. Additionally, Burns testified that although Futch claimed that Nemmer was a friend who he had just seen that night and who had handed over his entire checkbook to him, Futch could not produce an address or telephone number where Nemmer could be located.

Viewing all the evidence in the light most favorable to the verdict, we thus conclude that a rational trier of fact could have found that Nemmer did not authorize Futch to sign his name on the check in question, and therefore that Futch committed the

offense of forgery, beyond a reasonable doubt. *See Hooper*, 214 S.W.3d at 13 ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."). We overrule Futch's first and second issues.

## Motion to Suppress

In his third issue, Futch contends that the trial court abused its discretion in denying his motion to suppress evidence.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor; and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor

of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Johnson*, 68 S.W.3d at 652-53.

When reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *Kelly v. State*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818-19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 819.

Before trial, Futch filed a motion to suppress "all evidence seized as a result of the warrantless search and seizure of Defendant . . . pursuant to the terms and provisions of Art. 38.23(a), Texas Rules of Criminal Procedure." The motion stated that:

- Futch was arrested on or about January 25, 2011 in McLennan County, Texas, by a uniformed Bellmead police officer;

- Futch was arrested without an arrest warrant having been issued, and no search warrant had been issued to authorize a police search of him or his vehicle;

- There was no justification under existing law for his warrantless arrest on the occasion in question;

- On the occasion in question, the arresting officer had no objective facts to support a suspicion that Futch had committed a crime, was committing a crime, or was about to commit a crime;

- On the occasion in question, the arresting officer had no objective facts to support a warrantless search of him or his vehicle;

- On the occasion in question, the arresting officer had no objective facts to

support probable cause to arrest him without a warrant; and

- The warrantless search, seizure, and arrest of him on the occasion in question violated the terms, provisions, and meaning of Texas Code of Criminal Procedure Chapter 14, the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, and Article I, Section 9 of the Texas Constitution.

Attached to the motion was Futch's affidavit, in which he averred that he was arrested by the Bellmead Police on January 25, 2011 in McLennan County and that "[a]t the time of my arrest . . . Bellmead Police had no warrant for my arrest and none had been issued, and my vehicle was searched by Bellmead Police without a search warrant and without my knowledge or consent."

The trial court held a hearing on Futch's motion to suppress. The only evidence admitted at the hearing was Officer Kory Martin's "affidavit for a warrantless arrest." Officer Martin asserted that Futch committed the criminal offense of forgery. Officer Martin also stated that he arrested Futch and has good reason to believe and does believe that Futch committed the offense because Futch was found by Officer Martin in a suspicious place and under circumstances that reasonably show that he had been guilty of the offense, which is a felony. Officer Martin provided the following facts in support of the arrest:

> On January 25, 2010 [sic] I, Officer Kory Martin received a call in reference to a suspicious group of subjects who were trying to pass a check the night before for a large amount. The check was denied. I was advised that they were back again and Loss Prevention Terry Stepan believed they would attempt to pass this check again. I responded to that location and found that Officer Burns had the suspect detained. It was then found that the suspect identified as Johnathon Futch DOB: 3-4-84. However Johnathon signed the check as David Nemmer. The check was a personal check with the name David Eugene Nemmer Jr. Check #1121. David Eugene Nemmer was not present while Johnathon forged his signature. During

the investigation Johnathon consented to a search of his vehicle. Johnathon's wallet was located in his vehicle. Inside that wallet we located a credit card and drivers license belonging to a Richard Smith DOB: 2-14-77. Johnathon stated that he could not get a hold of any of the people whom the financial instrument and identification belong to. All of these items were taken into evidence. A check was also located in Johnathon's wallet. The check appeared to be fictitious in the fact that the name Richard Smith was placed on the front of the check along with an address and phone number. The phone number was not a working number.

Johnathon was placed under arrest for the possession of the documents belonging to Richard Smith along with a fictitious check.

The affidavit states that Officer Martin's testimony was sworn and subscribed before a "peace officer" in and for the State of Texas, and that person signed the affidavit.

The trial court denied Futch's motion to suppress evidence and made the following findings of fact and conclusions of law:

1. At the hearing, the only evidence submitted was the Affidavit for Warrantless Arrest from the State and an Affidavit from Defendant.

2. Based upon the affidavit for warrantless arrest, a Wal-Mart employee provided to the arresting officer satisfactory proof that a felony had been committed and that Defendant was about to escape so that there was no time to procure a warrant and that the officer did then arrest Defendant.

3. The Affidavit for Warrantless Arrest was properly sworn to before a person able to make oaths, in this case a peace officer in the course of and related to the performance of their duties as a peace officer.

4. Executing an Affidavit for Warrantless Arrest is an act performed when a peace officer is engaged in their duties and is related to those duties.

5. The arresting officer had consent to search Defendant's vehicle.

Futch challenges findings of fact and conclusions of law numbers 2, 3, 4, and 5.

Regarding finding number 2, Futch argues that the "four corners of the suppression hearing record" are insufficient to support the finding. Futch maintains that the "proof" provided by the Wal-Mart employee that a felony had been committed was "merely speculation based on a hunch" and that there is simply no evidence to support "that Defendant was about to escape" from anyone on the occasion in question. We disagree. The prevailing party on a motion to suppress "is afforded the strongest legitimate view of the evidence and *all reasonable inferences* that may be drawn from that evidence." *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011) (emphasis added). Based on Officer Martin's affidavit, not only did Stepan advise Officer Martin that she believed a suspicious group of people would attempt to pass a check that had been denied the night before, but Stepan also obviously provided Officer Martin with the personal check of David Eugene Nemmer Jr., on which Futch had signed "David Nemmer." This then led to the request to search Futch's vehicle as part of the investigation and the recovery of more evidence. Thus, the evidence admitted at the suppression hearing, when viewed in the light most favorable to the finding, is sufficient to support the finding that a Wal-Mart employee provided to Officer Martin satisfactory proof that a felony had been committed. *See* TEX. CODE CRIM. PROC. ANN. art. 14.03(a)(1) (West Supp. 2012) ("Any peace officer may arrest, without warrant . . . persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony."). The evidence admitted at the suppression hearing, when viewed in the light most favorable to the finding, is also sufficient to support that Futch was about to escape so that there was no time to procure

a warrant. Futch was leaving the store just after signing someone else's name to someone else's personal check, and he had a vehicle there. The trial court could reasonably infer that Futch would have left the premises in his vehicle had he not been detained.

Regarding finding number 3, Futch argues that there is no evidence that the signature of the person before whom Officer Martin supposedly swore his affidavit was in fact a peace officer. Futch states that the officer is not identified and that there is no evidence of his duties. But the affidavit expressly states that the person before whom Officer Martin swore and subscribed the affidavit was a peace officer in and for the State of Texas. Thus, viewing the affidavit in the light most favorable to the trial court's finding, we conclude that the affidavit provides sufficient evidence that the person was a peace officer.

Also regarding finding number 3, as well as finding number 4, Futch argues that the alleged peace officer whose signature appears on the affidavit is insufficient to transform it from a written report to an affidavit establishing probable cause for his arrest and search without the participation of a neutral, disinterested magistrate making that determination. We disagree. Section 312.011(1) of the Government Code states that an affidavit need only be "sworn to before an officer authorized to administer oaths." TEX. GOV'T CODE ANN. § 312.011(1) (West 2013). And section 602.002(17) of the Government Code provides, "An oath made in this state may be administered and a certificate of the fact given by . . . a peace officer. . . ." *Id.* § 602.002(17) (West 2012).

Regarding finding number 5, Futch argues that the record does not support that

Officer Martin had consent to search his vehicle and thus that Officer Martin had authority to conduct a warrantless search of his vehicle. Under the Fourth Amendment, a search is unreasonable when conducted without a warrant or probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012). A search conducted pursuant to consent, however, is specifically excepted from this general rule. *Schneckloth*, 412 U.S. at 219; *Tucker*, 369 S.W.3d at 185.

In response to Futch's sworn affidavit that the search of his vehicle was "without a search warrant and without my knowledge or consent," Officer Martin stated in his affidavit, "During the investigation [Futch] consented to a search of his vehicle." The trial court could reasonably infer from Officer Martin's statement that Futch knew that the officer was going to search his vehicle and agreed to the search. Futch contends, however, that when he filed his sworn affidavit, the burden shifted to the State to prove by clear and convincing evidence not only that he knew that the arresting officer was going to search his vehicle but also that he gave his *voluntary* consent for the warrantless search. But Futch's affidavit stated that the search was conducted without his knowledge and without his consent, not that he consented to the search but that his consent was coerced or involuntary. Thus, we conclude that the evidence admitted at the suppression hearing, when viewed in the light most favorable to the finding, is sufficient to support the finding that the arresting officer had consent to search Futch's vehicle.

In light of the foregoing, we hold that the trial court did not err in denying

Futch's motion to suppress.  We overrule Futch's third issue.

## *Brady* Issue

In his fourth issue, Futch contends that the State's suppression of evidence favorable to his defense violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution or Article 1, Section 19 of the Texas Constitution.  More specifically, Futch argues that the State withheld oral testimony in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by dismissing a witness who had voluntarily come to court to testify for the State.

After voir dire but before opening statements, the following exchange took place:

> [Defense Counsel]:  Yes.  Judge, a few minutes ago [Prosecutor] made a Brady type disclosure to me.  I don't want to run the risk of misstating what he told me.
> If you'll tell the judge.
>
> [Prosecutor]:  I'll do it.  Judge, there was one witness that was on our subpoena list.  Her name is Sarah Parrish.  She drifts.  She's very difficult to find.  She's not stable.  The subpoena on her actually was never served.  It went to Coryell County with her last known address, and they told us -- they sent it back, "Unable to serve subpoena."  She showed up today.  Her remark to me was much like it was to the officers the night of this – when the defendant was arrested, that he had permission from the check holder.  She, technically, was never served by subpoena.  I saw her at lunch and I talked with her at lunch, and she said, "Are you going to need me right now?"  I said, "no," and she said, "Could I go get lunch and then come right back or be back by 1:30?"  I said, "sure," because I don't really have any desire to call her to the stand.  As soon as I saw [Defense Counsel] after that, I let him know what she had said, and that's the gist of it.  I mean, quite honestly, I find her completely untruthful, and I don't see any need to call her.  That's why – in the interest of fairness and disclosure, I wanted to give him everything we had on that.  Today is the first chance I've ever had to talk to her, at lunch.
>
> THE COURT:  She never actually got served with the subpoena?

[Prosecutor]:  No.  She just showed up today, because the way the officer – the only way the officer – she has no phone number, she has no permanent address that we can find her at, and either one of the deputies or investigators from Coryell County or another police officer – I'm not sure – sent her a Facebook message.  That's what her mom said was the only way to get in touch with her was to send her a Facebook message and wait.  They didn't know if they would have her here in time or not.  That's what they were told.  They sent her a Facebook message, and she told me she got it, I guess, this morning, and she showed up.

THE COURT:  Modern culture, nothing like it.

[Defense Counsel]:  Judge, for the record, I've been looking for her, myself, for two months.  I turned every rock I could, including using the Facebook. . . .  We have not had any response at all.  Now, this is a very crucial element of the offense, of course.  We don't have the witness.  We don't have any means to get her.

[Prosecutor]:  She said – the best I can say is she said she'd be back at our office at 1:30, and we were over here before 1:30, and I said I'd come back for her if we needed her.

THE COURT:  [Defense Counsel], did the defense issue a subpoena for her also?

[Defense Counsel]:  No.  I didn't know where to issue it, Judge.  I didn't know where to send it.

THE COURT:  So what is it you're suggesting that I do about it?

[Defense Counsel]:  Well, I want to get this crucial piece of evidence before the jury.  I mean, it's a crucial part of their case.  I don't want to break any rules of decorum or anything like that, Judge, but I want to get some guidance from the Court about how to do it.

THE COURT:  Well, my suggestion is to find the witness.

[Defense Counsel]:  I don't know where to look.

THE COURT:  I don't either.

[Prosecutor]:  I mean, she may be back at our office.  Like I said, we left at 1:15.

[Defense Counsel]: Well, you know, I can't get in the DA's office without an escort, Judge.

THE COURT: Find out if she's back in you-all's office. If she is, serve her with the subpoena.

[Prosecutor]: Okay.

[Prosecutor #2]: We don't have a subpoena for her anymore. Right?

[Prosecutor]: It came back not returned. I don't have another one to hand her now. It has come back unable to locate.

THE COURT: Where is the original subpoena?

[Prosecutor]: To be honest, I don't know. I handed it to my investigator. It was sent to Coryell County.

[Prosecutor #2]: It was sent to Coryell County, and they sent the return back.

THE COURT: Well, if she's over there and she comes to your office, have her brought over here. Escort her with an officer, if you have to, and I'll talk with her.

[Prosecutor #2]: Okay.

[Prosecutor]: Do you want me to go look right now before we get going?

THE COURT: You can call. I want to get the jury in here.

[Prosecutor]: Okay.

To preserve a complaint for review, the complaint must be "made to the trial court by a timely request, objection, or motion that . . . states[s] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were

apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). The record must also show that the trial court "ruled [adversely] on the request, objection, or motion, either expressly or implicitly" or "refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a)(2); *see Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003) (reiterating rule 33.1's requirement that a party obtain an adverse ruling).

Here, Futch's counsel stated on the record that the prosecutor made a "Brady type disclosure" to him and later that he had been looking for the witness and wanted to present her testimony to the jury, but Futch never made any objection, or even a suggestion, that the State had done anything wrong. Futch did not move for a continuance to obtain more time to find the witness or to serve her with a subpoena, and because Futch did not ask for a continuance, the trial court never denied a continuance. Instead, the trial court attempted to help Futch find the witness by telling the prosecutors to find out if the witness had returned to their office. Thus, we hold that Futch did not preserve this issue for review. *See* TEX. R. APP. P. 33.1(a); *Smith v. State*, 314 S.W.3d 576, 586 (Tex. App.—Texarkana 2010, no pet.) (holding *Brady* challenge not preserved because trial court never ruled on complaint); *Gutierrez v. State*, 85 S.W.3d 446, 452 (Tex. App.—Austin 2002, pet. ref'd) ("[W]hen previously withheld evidence is disclosed at trial, the defendant's failure to request a continuance waives any *Brady* violation."). We overrule Futch's fourth issue.

## Conclusion

Having overruled all of Futch's issues, we affirm the trial court's judgment.

                              REX D. DAVIS
                              Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed July 18, 2013
Do not publish
[CR25]