

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00012-CR

———————————————————

XAVIER PATTERSON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F20-962-431

---

Before Kerr, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A jury convicted Appellant Xavier Patterson of murdering his girlfriend, Meagan Darling. *See* Tex. Penal Code Ann. § 19.02. The jury assessed his punishment at sixty years' confinement, and the trial court sentenced him accordingly and made an affirmative finding that family violence had occurred. *See* Tex. Code Crim. Proc. Ann. art 42.013. In two issues, Patterson argues (1) that the trial court abused its discretion by admitting extraneous evidence of his prior assaultive behavior toward Darling over his objections made under Texas Rules of Evidence 403 and 404 and (2) that the evidence is insufficient to support his conviction because there is "little evidence of a culpable mental state." We will affirm.

## II. BACKGROUND

### A. Darling Begins a Relationship with Patterson

In or around 2015, Darling met Patterson. At that time, Darling had two small children—a son, I.B., and a daughter, M.B.[1] Soon after they met, Darling and Patterson began a romantic relationship. Two sons were born out of that relationship—A.P. and E.P.

---

[1]To protect the anonymity of the children in this case, we will use initials to refer to them. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

**B. Darling and Patterson's Relationship is Marked by Volatility and Abuse**

Numerous witnesses at Patterson's trial testified—often over his Rule 403 and 404 objections—about the volatility and abuse permeating his relationship with Darling.

Darling's sister, Michelle Elliott, testified that she had many conversations with Darling in which Darling indicated that Patterson had threatened her and told her that "he was going to kill her." Darling told Elliott about occasions where she had been physically abused by Patterson—mentioning that he had once punched her in the back of her head while she was holding A.P., which had caused A.P. to fall and hit concrete, and that he had once thrown a phone at her leg causing a "big bruise." Elliott stated that Darling "was always upset and distraught and always felt stuck." She testified that Darling often called the police regarding her incidents with Patterson, that Patterson would leave before the police arrived, and that Darling would eventually take Patterson back.

Christie Govan, Darling's friend, testified that Darling had predicted that Patterson was going to kill Darling out of anger. Govan stated that she had seen injuries on Darling on multiple occasions, explaining that she had seen scratches, bruises, and fingerprint marks on Darling's neck. Darling told Govan that Patterson had caused those injuries.

Brittany Freeman, another one of Darling's friends, described Darling and Patterson's relationship as "very toxic, abusive, [and] unhealthy." Darling told Freeman that she was "scared for her life" and that Patterson was going to kill her.

Jennifer Juarez, who lived with Darling from approximately December 2017 through March 2018, testified that Darling had moved in with her during those months to get away from Patterson. Juarez recounted a phone conversation she had with Darling in January or February 2018, in which a distraught Darling said that Patterson had hit her in the driveway while she was holding A.P.—who was a baby at the time—and that she had dropped A.P. on the concrete ground.[2]

Whitney Price, Darling's friend, testified that Darling had tried to end her relationship with Patterson on numerous occasions but that Darling always allowed Patterson back into her life. Whitney[3] stated that at some point around 2018, Darling moved into a duplex next door to her own duplex and that Darling's duplex shared a wall with hers. Whitney stated that she and Darling had devised a plan in which Darling would set off her car alarm if she and Patterson were having an altercation and Darling "feared for her life." Upon hearing the car alarm, Whitney was to call the

[2]It appears that this incident recounted by Juarez is the same incident recounted by Elliott.

[3]Whitney Price's sister, Tiffany Price, also testified at trial. To avoid confusion, we will refer to the Price sisters by their first names.

4

police. Whitney also testified about occasions where Patterson had damaged the front and back doors of Darling's duplex because Darling would not let Patterson inside.

Tiffany Price, another friend of Darling's, testified that Darling had told her on multiple occasions that she feared Patterson. After Patterson purchased a gun, Darling told Tiffany that she was fearful that Patterson "would use that gun to kill her" and that "she was going to make a will for her kids."

James Hoxie, a friend of Patterson's and his only witness at trial, painted a different picture of Darling and Patterson's relationship. Hoxie testified that Patterson would come to his home whenever he got kicked out of Darling's home. Hoxie indicated that Patterson would stay with him "anywhere from a couple of days to maybe a week or two" on such occasions. Hoxie stated that during the times that Patterson would stay with him, Darling would often come by Hoxie's home to try to speak to Patterson. According to Hoxie, Darling "slashed" fourteen[4] of the tires to Hoxie's vehicle when she visited his home. Hoxie also stated that Darling had damaged the door to his home because he would not allow her inside. According to Hoxie, Darling was "[v]ery angry" and did not appear to be afraid of Patterson.

---

[4]Hoxie stated that his vehicle only had four tires; he indicated that Darling had "slashed" his tires on "[s]everal occasions."

## C. Police Respond to Domestic Incidents Involving Darling and Patterson

At Patterson's trial, several witnesses testified—often over his Rule 403 and 404 objections—about calls made to police regarding domestic incidents between him and Darling and about the police response to such incidents.

On August 13, 2018, Denton police responded to a domestic violence call at Darling's duplex. During that call, Darling indicated that she had just been assaulted by Patterson. Darling told responding officers that Patterson had grabbed her hair and pushed her against a wall. The responding officers noticed marks on Darling's neck, and Darling indicated that Patterson had caused the marks.[5]

On September 26, 2018, Whitney called 911 to report that Patterson was "whoopin' [Darling's] ass out here." Whitney testified that she had made that call after her daughter had alerted her to screaming outside.

The next day, three 911 calls were placed regarding an incident between Patterson and Darling—two calls by Whitney and one by Darling. In the first call, Whitney told the dispatcher that Patterson was "beating down" the front door of Darling's duplex, and during that call, Whitney stated that Patterson had just "kicked down the front door" and gone into Darling's duplex and taken Darling's phone. In the next call, Darling stated that Patterson had "kicked [her] door in" and taken her phone and left. She also stated that Patterson had dropped his own phone, which she

---

[5]Photographs depicting the marks on Darling's neck were admitted at Patterson's trial over his Rule 403 and 404 objections.

had used to make the 911 call. In the third call, Whitney told the dispatcher that Patterson had returned to the area and had gone into her duplex to get to Darling.[6] Denton police responded to those phone calls, and Patterson was "trespassed from" Darling's residence.

On November 16, 2019, Darling called 911 to report another domestic incident with Patterson. Darling told the dispatcher that Patterson had broken the back door of her duplex, that he had told her that he was going to "knock the f*** out of [her]," that she was afraid that Patterson was going to hurt her, that she was "helpless," and that she had previously had Patterson "trespassed from" the property but he kept showing up. A responding officer noted damage to the backyard gate of Darling's duplex and to the duplex's sliding back door.

## D. The Months Leading Up to Darling's Death

Elliott—Darling's sister—and Govan—one of Darling's friends—each testified that Child Protective Services had gotten involved with Darling's family the last time she had called the police on Patterson. Darling told Elliott and Govan that she was no longer going to call the police on Patterson because she feared that she would lose custody of her children.

---

[6]Whitney testified that Darling had entered Whitney's duplex through an unlocked door and that Patterson had come into the duplex after Darling. Whitney stated that Patterson left once his phone was returned to him.

Communications with her family and friends in the months leading up to her death indicate that Darling continued to be afraid of Patterson. In text messages with Elliott, Darling stated that she wanted to move to get away from Patterson but that she was afraid that Patterson "w[ould] probably come [and] kill [her]." Around a month before Darling's death, Darling told Whitney that she remained with Patterson because she loved him and that she was scared to leave him. Darling told Whitney that Patterson would kill her if she ever left him.

The month before Darling's death, Darling, Patterson, and her four children moved to a home in Denton. Elliott testified that Darling had moved because she was trying to get away from Patterson. Elliott stated, however, that Darling ultimately allowed Patterson into the home because he had indicated that he was going to get a job and that he and Darling "were going to be a family."[7]

### E. The Night of Darling's Death

Around 7:30 p.m. on January 10, 2020, a 911 call was placed from Darling and Patterson's home. The caller did not identify himself but stated, "We have an emergency." The caller then ended the call.

Cameron Schaffer, a police officer with the Denton Police Department, was dispatched to Darling and Patterson's home in response to the call. Another officer—identified in the record simply as "Officer Robberson"—accompanied

---

[7]Govan similarly said that Darling allowed Patterson to move into the home because "she loved him[,] and he was doing better and working."

8

Schaffer on the call.[8]  When Schaffer and Robberson arrived at the home, they saw a vehicle in the driveway that contained three unattended young children—M.B., A.P., and E.P.  Schaffer opened the door of the vehicle, and one of the children told him that the child's mother was dead inside the home.  The garage door of the home was open, as was the door leading from the garage to the home, and Schaffer and Robberson entered the home.  The officers announced their presence as they walked into the home, and as they entered the kitchen, I.B.—who was eleven at the time—walked into the kitchen from an adjacent hallway that led to the master bedroom.  I.B. indicated that his mother was in the master bedroom and that Patterson was also inside the home.

Schaffer and Robberson walked into the hallway leading to the master bedroom, and Schaffer observed a pistol on the ground just outside the bedroom.  The bedroom door was open, and Schaffer saw Darling lying on the floor with a gunshot wound to her head.  Schaffer and Robberson called out to Patterson, but they did not receive a response, so they entered the bedroom.  After not finding Patterson inside the bedroom, they entered the master bathroom, and then they entered the master closet located in the master bathroom.  They found a shirtless Patterson slumped on the ground in the closet, where he was covered in blood and bleeding from neck wounds.  They also found a knife near Patterson.  Patterson was

---

[8]Schaffer testified that Robberson was in field training at that time and that he was acting as Robberson's temporary field training officer.

9

unresponsive but breathing. Schaffer rendered first aid to Patterson, and paramedics arrived and took Patterson to the hospital.

Gina Riley, a crime scene investigator with the Denton Police Department, was called to the scene. Riley took numerous photographs of the crime scene that were admitted into evidence. The photographs depicted, among other things, the gun found in the hallway outside the master bedroom, Darling lying on the ground next to the bed, blood stains on the bed and blood pooling on the mattress, a spent cartridge found on the bed, a bullet fragment found on the floor near the bed, a live round found on the floor near the bed, a damaged live round found on the floor near the bed, a hammer found next to the damaged live round, a knife found in the master bathroom, and a pizza cutter.[9]

## F. Patterson's First Interview with Police

Patterson was taken from the scene by paramedics to a hospital where he was treated for his injuries. Later that night, he was released from the hospital and interviewed by police. During that interview, Patterson stated the following:

- He arrived home from work around 6:00 p.m. and took a shower and shaved his head.

- Darling became upset that he had taken too long in the bathroom and told him to leave the house.

---

[9]It is unclear from the record in which room the pizza cutter was found.

10

- An argument ensued as he gathered his belongings to leave, and Darling told him to leave without his belongings.

- He retrieved a gun from a safe in the master closet, explaining that he did not want to leave the gun behind because there were children in the home.

- While holding the gun in his right hand, he walked back and forth from the bathroom to the bedroom as he gathered his belongings, while Darling sat on the bed.

- During one of his trips between the bedroom and the bathroom, Darling grabbed his hand, and they started to "wrestle" on the bed.

- During that "tussle," the gun in his hand "went off."

- After the shooting, he told I.B. that he was going to have to kill himself because police would not believe that the shooting was an accident given that he was black and Darling was white. I.B. told him that he did not have to hurt himself.

- He hugged the three younger children and put them in his car in the driveway.

- He gave I.B. the passcode to his phone and told him to wait to call 911 until after he was dead.

- He called 911 and asked for help.

- When he heard police arrive at the home, he started stabbing himself in an attempt to kill himself.

Patterson's first interview was halted when his neck wound began to bleed, and paramedics were called to treat him.

## G. Patterson's Second Interview with Police

Patterson was re-interviewed by police on January 13, 2020—three days after the shooting. During that interview, Patterson stated the following:

11

- He and Darling had arguments "all the time."

- On the night of the shooting, he and Darling argued after he had taken a long shower, and Darling had told him to leave.

- While he was attempting to gather his belongings, he kept walking past Darling, which made her angry.

- He had not been able to pack a bag or gather much of his belongings—apart from the gun that he had retrieved from a safe in the closet—because the family had just moved into the house and "everything was everywhere."[10]

- During the argument, he and Darling had a "scuffle" on the bed, he stood up and tried to pull away from her, she "slapped" his hand, and the "gun went off."

- He gathered the three younger children and put them in his car.

- He moved Darling from the bed to the floor during an attempt to get her to the car so that he could take her to the hospital.

- He set his phone on the counter and told I.B. to go to the car and wait to call the police until after he had killed himself. After noticing that the phone was missing from the counter, he went outside and retrieved the phone from I.B.

- He called 911 and asked for help.

- He tried to kill himself with the gun, but it was jammed.[11] He hit the gun with a hammer in an attempt to make it start working.

- He retrieved a knife and a pizza cutter from the kitchen.

---

[10]Tony Salas, the supervisor of the Major Crimes Unit of the Denton Police Department at the time of the shooting, testified that detectives found no indication that Patterson had gathered any of his belongings other than his gun.

[11]Salas inspected the gun after the shooting; he noted that the gun was damaged and that it looked like it had been struck with something.

- He started trying to kill himself once he heard the police arrive.

## H. I.B.'s Testimony

I.B., who was fourteen years old at the time of trial, testified regarding Patterson's prior abuse of Darling and regarding what occurred on the night of the shooting. I.B. told the jury the following:

- He was around seven years old when he first met Patterson.

- Darling and Patterson argued on multiple occasions, and I.B. heard Darling scream in pain and fear during such arguments. I.B. observed bruising on Darling's arms and legs after the arguments.

- Patterson damaged property during arguments with Darling. On one occasion when Darling had kicked Patterson out of the family home and would not let him enter, Patterson threw a rock at one of the home's windows, causing it to break. On another occasion when Darling would not let Patterson into the family home, Patterson attempted to kick down the front door.

- On the day of the shooting, I.B. arrived home from school around 5:00 p.m., and Patterson arrived home soon after.

- Patterson and Darling started arguing before Patterson took a shower. After Patterson's shower, Patterson went into the garage, came back inside the home, and the argument with Darling continued.

- During Darling and Patterson's argument, Darling told Patterson to leave the home and to give her the key.

- During the argument, Darling entered the living room where the children were watching television and picked up E.P., who was an infant at the time. Darling made E.P. a bottle and took E.P. into the master bedroom.

- Shortly after Darling took E.P. into the bedroom, I.B. heard a loud noise. I.B. ran into the bedroom and noticed Darling slumped on the bed with E.P. in her

13

hands. I.B. also observed blood on the wall. Patterson was pacing near the bed and yelling Darling's name.

- I.B. grabbed E.P. and gathered his other siblings and put them in Patterson's car in the driveway. I.B. went back inside to check on Darling and figure out what had happened.

- After arriving back in the house, Patterson told I.B. that he and Darling were "fighting over the gun, and the trigger went off."

- Patterson told I.B. that he was going to hurt himself or kill himself because he would be blamed for Darling's death, noting that he was black and Darling was white. I.B. tried to talk Patterson out of hurting himself.

- Patterson told I.B. to help him pick up Darling so that they could take her to the car. While they were attempting to move Darling, she started shaking, so they put her on the ground in the bedroom.

- Patterson gave I.B. a phone but instructed him not to call 911. I.B. went outside to the car and called his grandmother, telling her to call 911. Patterson then went outside and took the phone from I.B.

- After returning inside the home, Patterson got "a pizza cutter and something else," and he went to the bathroom and "started trying to cut hi[m]self."

- Around four hours after police arrived, I.B. was interviewed at the Children's Advocacy Center for North Texas. During that interview, I.B. did not mention that Darling had E.P. with her when she was shot. I.B. said that he did not mention it because he was "under stress" during the interview and "wasn't thinking fully."[12]

---

[12]Elinés Negrón, who interviewed I.B. at the Children's Advocacy Center, testified that I.B. was calm at some points of the interview but in shock and "kind of all over the place" at other points of the interview. Negrón also stated that I.B. told her that after Darling had told Patterson to leave, Patterson went into the living room and kissed A.P. and E.P. goodbye, then Patterson returned to the bedroom, and I.B. heard the gunshot moments later.

- During his interview at the Children's Advocacy Center, I.B. stated that Patterson had also tried to kill himself with the gun, but the gun jammed. I.B. told his interviewer that Patterson ran into the garage, grabbed a hammer, and hit the gun with the hammer in an attempt to make it work.

## I. Testimony Regarding the Gun

Deion Christophe, a firearm and toolmark examiner for the Plano Police Department, testified that the gun found at the scene was submitted to him for examination. Christophe identified the gun as a Kahr Arms Model CW380 pistol. He stated that the standard CW380 pistol comes with an internal firing pin safety. Christophe explained that "[a]n internal firing pin safety is a safety that prevents the firing pin from moving fully forward in travel unless the trigger is pulled fully to the rear." He stated that one purpose of the internal firing pin safety is to prevent a gun from firing when "the trigger is tripped or accidentally engaged." With the presence of an internal firing pin safety, the trigger "would have to be fully pulled" for the gun to fire. Christophe also indicated that the trigger pull on a standard CW380 is three pounds or greater.[13] Christophe further testified that the gun found at the scene was nonfunctional and unable to be test-fired.

## J. Testimony Regarding Darling's Autopsy

Stacey Murthy, a medical examiner for the Tarrant County Medical Examiner's Office, performed an autopsy on Darling. Murthy observed that Darling had

---

[13]In contrast to the CW380, Christophe testified that a "hair trigger" is a trigger with a pull force of less than two pounds.

sustained a fatal gunshot wound to the right side of her head.[14]  Due to the presence

of stippling but not soot on Darling's face, Murthy opined that the gun was fired at a

range of one to four feet from Darling.[15]  Murthy testified that the trajectory of

Darling's gunshot wound was downward, going from Darling's right to her left and

from her front to her back.  Murthy stated that she would not expect to see such a

trajectory if someone had hit the hand or the arm of the holder of the gun upward,

noting, "I would not expect an upward motion of a gun to have a downward motion

of a bullet."  Murthy determined that Darling's cause of death was a gunshot wound

to the head and that the manner of Darling's death was homicide.

### III.  DISCUSSION

### A.  Patterson's Complaints Regarding the Admission of Extraneous Evidence

In his first issue, Patterson argues that the trial court abused its discretion by

admitting extraneous evidence of his prior assaultive behavior toward Darling over his

Rule 403 and 404 objections.[16]

---

[14]Murthy also observed that Darling had other minor injuries, consisting of contusions to the back of Darling's right arm and small abrasions on Darling's right hand, left thumb, and right wrist.

[15]Murthy stated that "[s]tippling is the unburned gunpowder that is embedded in the skin" of a gunshot victim, while "[s]oot [is] the burned gunpowder that gets deposited on the skin."

[16]We note that Patterson made many Rule 403 and 404 objections at his trial and that the trial court admitted much evidence over those objections.  We also note, however, that Patterson's brief only speaks broadly to those objections and evidence, rather than specifically detailing the objections he complains should have been

16

### 1. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). Under that standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the "zone of reasonable disagreement." *Id.* If the trial court's evidentiary ruling is correct on any applicable theory of law, we will not disturb it. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

### 2. Applicable Law Regarding Relationship Evidence[17]

Articles 38.36(a) and 38.371 of the Texas Code of Criminal Procedure authorize the admission of certain evidence concerning the relationship between the accused and the victim. *See* Tex. Code Crim. Proc. Ann. arts. 38.36(a), 38.371. Article 38.36(a) provides,

---

sustained and the admitted evidence that he complains should not have been admitted. We will assume, without deciding, that Patterson has preserved his Rule 403 and 404 complaints.

[17]We recently issued an opinion—*Baxter v. State*, No. 02-22-00258-CR, 2023 WL 8268292 (Tex. App.—Fort Worth Nov. 30, 2023, pet. ref'd) (mem. op., not designated for publication)—that involved strikingly similar legal issues to the ones involved in this appeal. Both cases involved a man's killing his significant other, the State's presenting extensive evidence regarding the man's relationship with and prior abuse of his significant other, and the trial court's overruling of defense counsel's objections to the admission of such evidence under Rules 403 and 404. *See id.* at *6. Due to the similarities of these issues and the recent vintage of *Baxter*, there is significant overlap in our discussion of the applicable law in this case and the applicable law cited in *Baxter*, as is there significant overlap in the structure of our analysis.

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

*Id.* art. 38.36(a). The nature of a relationship—such as whether the victim and the accused were married, estranged, separated, or divorced—is "clearly admissible under this Article." *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006). Prior acts of violence between the victim and the accused may be offered to illustrate the nature of the relationship. *Id.* These specific acts of violence must meet the requirements of the Texas Rules of Evidence—including Rules 403 and 404—in order to be admissible. *Id.*; *Jackson v. State*, No. 02-11-00414-CR, 2012 WL 6049074, at \*3 (Tex. App.—Fort Worth Dec. 6, 2012, pet. ref'd) (mem. op., not designated for publication).

Article 38.371, which applies to family-violence prosecutions, expressly allows "evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . . , including testimony or evidence regarding the nature of the relationship" between the victim and the defendant. Tex. Code Crim. Proc. Ann. art. 38.371(b). "Thus, Article 38.371(b) expressly provides for the admission of extraneous[-]offense evidence regarding the nature of the relationship between [the victim and the defendant]." *Gaulding v. State*, No. 02-21-00096-CR, 2022 WL 17986026, at \*4 (Tex. App.—Dec. 29, 2022, pet.

18

ref'd) (mem. op., not designated for publication) (first citing *James v. State*, 623 S.W.3d 533, 546 (Tex. App.—Fort Worth 2021, no pet.); and then citing *Mourning v. State*, No. 02-19-00168-CR, 2020 WL 6165309, at *4–5 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op., not designated for publication)). The evidence, however, must still be otherwise admissible under the Texas Rules of Evidence—including Rules 403 and 404—in order to be admitted. Tex. Code Crim. Proc. Ann. art. 38.371; *Garcia*, 201 S.W.3d at 702–03; *Emich v. State*, No. 02-18-00059-CR, 2019 WL 311153, at *6 (Tex. App.—Fort Worth Jan. 24, 2019, pet. ref'd) (mem. op., not designated for publication); *see Payne v. State*, No. 02-17-00268-CR, 2019 WL 2223575, at *2 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication) ("[T]he admission of evidence under [Article 38.371] does not allow admission of evidence that is proffered solely to show character conformity or that otherwise violates the [R]ules of [E]vidence.").

We thus turn to Patterson's Rule 403 and 404 complaints.

### 3. Patterson's Rule 404 Complaints

We begin with Rule 404.

#### a. Applicable Law

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Tex. R. Evid. 401. Relevant evidence is generally admissible. Tex. R. Evid. 402. Rule 404(b)(1), however, precludes the admission of evidence of a

19

crime, wrong, or act solely to prove a person's character to show that he acted in conformity with that character on a particular occasion. Tex. R. Evid. 404(b)(1). Rule 404(b)(2) allows for such evidence to be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b)(2).

The purposes listed in Rule 404(b)(2) "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. Indeed, extraneous evidence may also be introduced to rebut a defensive theory. *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App. 2002); *Richardson v. State*, 328 S.W.3d 61, 71 (Tex. App.—Fort Worth 2010, pet. ref'd) (per curiam). Thus, while Rule 404(b) limits character evidence, it is nevertheless a rule of inclusion. *De La Paz*, 279 S.W.3d at 343; *Gaulding*, 2022 WL 17986026, at *4.

### b. Analysis

Here, the State argues that the complained-of extraneous evidence was offered to show the nature of Darling and Patterson's relationship. We agree. The complained-of evidence—which reflected past instances of domestic violence between Patterson and Darling, their volatile on-again-off-again relationship, and her fear of him—gave the jury important insight into the nature of their relationship. *See Baxter*, 2023 WL 8268292, at *9 (holding that prior incidents of domestic violence between defendant and victim, his controlling demeanor over her, and her fear of him were admissible under Article 38.371 and Rule 404(b)); *Gaulding*, 2022 WL 17986026,

20

at *4 (similar); *James*, 623 S.W.3d at 545 ("Article 38.371, which applies to family-violence prosecutions, provides another non-character-conformity purpose for admitting extraneous-offense evidence."); *Mourning*, 2020 WL 6165309, at *5 ("[The defendant's] history of drug use—and [the victim's]—gave the jury insight into the nature of their volatile relationship."). Because the complained-of evidence showed the nature of Darling and Patterson's relationship, it was admissible for that purpose under Articles 38.36(a) and 38.371, as well as Rule 404(b). *See* Tex. Code Crim. Proc. Ann. arts. 38.36(a), 38.371; Tex. R. Evid. 404(b); *Baxter*, 2023 WL 8268292, at *9 ("Because the complained-of evidence showed the nature of [the defendant] and [the victim's] relationship, it was admissible for that purpose.").

The State also argues that the complained-of evidence was introduced to show Patterson's intent, the lack of mistake, and the lack of accident regarding Darling's death. We agree. The central issue in this case was whether Patterson shot Darling accidentally. The complained-of evidence showed the violent and volatile relationship between Darling and Patterson—and her fear that he would kill her if she left him—and strongly served to demonstrate Patterson's intent to kill Darling and the lack of mistake and lack of accident concerning her death. *See Baxter*, 2023 WL 8268292, at *9; *Norvell v. State*, No. 06-21-00051-CR, 2022 WL 1509299, at *7 (Tex. App.—Texarkana May 13, 2022, no pet.) (mem. op., not designated for publication) ("The extraneous-offense evidence showed the intimidating nature of the relationship between [the defendant] and [the victim] and strongly served to make more probable

21

the existence of the required *mens rea*."); *Smith v. State*, 314 S.W.3d 576, 592 (Tex. App.—Texarkana 2010, no pet.) (holding that evidence of defendant's prior assault and interactions with victim in months preceding her death was admissible relationship evidence relevant to show defendant's intent in killing victim, as well as absence of mistake and accident concerning her death). Because the complained-of evidence showed Patterson's intent, the lack of mistake, and the lack of accident regarding Darling's death, it was admissible under Rule 404(b). *See Baxter*, 2023 WL 8268292, at *9 ("Because the complained-of evidence showed the nature of [the defendant] and [the victim's] relationship, it was admissible for that purpose."); *Norvell*, 2022 WL 1509299, at *7 ("Because extraneous offenses are admissible to show intent under Rule 404(b)(2) . . . the trial court . . . did not abuse its discretion in overruling [the defendant's] Rule 404(b) objection."); *Smith*, 314 S.W.3d at 592 (holding that because extraneous-offense evidence was "introduced for a purpose other than character conformity, had relevance to intent, absence of mistake, and the nature of the relationship between [the defendant and the victim] . . . it was admissible").

The State also argues that the complained-of evidence was introduced to rebut Patterson's defensive theory that his shooting of Darling was an accident. Once again, we agree with the State. Patterson's opening statement began with the words, "Good morning. This was an accident. Every single shred of evidence the State's going to bring is going to prove to you this was an accident." That theory was

advanced through Patterson's cross-examination of the State's witnesses, and it was further advanced during his closing argument, where his trial counsel stated, "This was an accident, and not a single shred of evidence that has been brought to you proves anything otherwise." Thus, the complained-of evidence was also admissible under Rule 404(b) to rebut the defensive theory that Darling died from an accidental shooting. *See Baxter*, 2023 WL 8268292, at *9 ("[T]he complained-of evidence was also admissible under Rule 404(b) to rebut the defensive theory that [the victim] died by a drug overdose."); *Cabello v. State*, No. 13-19-00341-CR, 2022 WL 3451368, at *23 (Tex. App.—Corpus Christi–Edinburg Aug. 18, 2022, no pet.) (mem. op., not designated for publication) ("[I]t is at least subject to reasonable disagreement whether the extraneous[-]offense evidence was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory.").

Because the complained-of evidence was admissible as relationship evidence; as evidence to show Patterson's intent, the lack of mistake, and the lack of accident regarding Darling's death; and to rebut Patterson's defensive theory that his shooting of Darling had been accidental, we hold that the trial court did not abuse its discretion by overruling Patterson's Rule 404 objections.

### 4. Patterson's Rule 403 Complaints

We next turn to Rule 403.

### a. Applicable Law

Under Rule 403, a trial court may exclude relevant evidence if the probative value of the evidence "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403; *see Emich*, 2019 WL 311153, at *7.

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial." *James*, 623 S.W.3d at 546–47 (first citing *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g); and then citing *Emich*, 2019 WL 311153, at *7). Thus, the balance in evaluating the admission of evidence under Rule 403 "is always slanted toward admission of relevant evidence." *Fernandez v. State*, No. 02-18-00483-CR, 2020 WL 1057323, at *6 (Tex. App.—Fort Worth Mar. 5, 2020, pet. ref'd) (mem. op., not designated for publication) (citing *De La Paz*, 279 S.W.3d at 343 & n.17). Because of this presumption, it is the burden of the party opposing the admission of the evidence to show that the evidence's probative value is substantially outweighed by one or more of the dangers listed in Rule 403. *Gaulding*, 2022 WL 17986026, at *5; *James*, 623 S.W.3d at 547.

To determine whether evidence is admissible over a Rule 403 objection, the trial court must conduct a balancing test. *Montgomery*, 810 S.W.2d at 389; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). The Texas Court

of Criminal Appeals has instructed that when undertaking a Rule 403 analysis, courts must balance the following factors (the *Gigliobianco* factors): (1) the inherent probative force of the proffered item of evidence and (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641–42.

### b. Analysis

As to the first *Gigliobianco* factor—the inherent probative force of the proffered evidence—we conclude that the evidence was highly probative to show Patterson's relationship with Darling; to show his intent, the lack of mistake, and the lack of accident regarding her death; and to rebut his defensive theory that her shooting was an accident. As discussed above during our analysis of Rule 404, the central issue in this case was whether Patterson's shooting of Darling was accidental. Thus, the complained-of evidence—which reflected past instances of domestic violence between Patterson and Darling, their volatile on-again-off-again relationship, and her fear of him—was highly probative. *See Baxter*, 2023 WL 8268292, at *11 (holding that evidence of "past instances of domestic violence" between defendant and victim, his controlling demeanor over her, and her fear of him were "highly probative"); *James*,

25

623 S.W.3d at 548 (holding that "the probative value of the extraneous-offense evidence was strong" where it "was probative of the nature of [the defendant's] abusive relationship with [the victim]" and it "rebut[ted] the defensive theory of fabrication"). This factor weighs in favor of the admission of the complained-of evidence.

As to the second *Gigliobianco* factor—the proponent's need for the evidence—we note that no eyewitness testified as to how Darling died. In the absence of such eyewitness testimony, the complained-of evidence was needed to support the State's theory that the shooting of Darling was not accidental. *See Baxter*, 2023 WL 8268292, at *11 (holding that because of the lack of eyewitnesses to the victim's death, "the need for the complained-of evidence was high to support the State's theory that [the victim] died at [the defendant's] hands"); *James*, 623 S.W.3d at 548 ("The State also had a strong need for the extraneous-offense evidence because no one witnessed the charged offenses."); *McGregor v. State*, 394 S.W.3d 90, 122 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (holding that State had need for evidence—thus favoring admissibility of complained-of extraneous evidence—where there were no eyewitnesses to the subject murder). This factor weighs in favor of the admission of the complained-of evidence.

As to the third through fifth *Gigliobianco* factors—any tendency of the evidence to suggest a decision on an improper basis, any tendency of the evidence to confuse or distract the jury, and any tendency that a jury that has not been equipped to

26

evaluate the probative force of the evidence would give it undue weight—we note that the trial court gave the jury the following limiting instruction,

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any other purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

We are to presume that the jury followed the trial court's instruction. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Although this presumption is rebuttable, an appellant has the burden to refute it by pointing to evidence that the jury failed to follow the trial court's instructions. *Id.* Here, Patterson has not pointed to any evidence that demonstrates that the jury failed to follow the trial court's limiting instruction. *See Baxter*, 2023 WL 8268292, at *11 (rejecting argument that jury would be confused by evidence or would use it for an improper purpose where trial court gave limiting instruction and appellant did not suggest that jury failed to follow instruction); *Gaulding*, 2022 WL 17986026, at *6 ("These instructions—which we presume the jury followed—equipped the jury to weigh the extraneous[-]offense evidence properly and minimized the risk of the jury's improperly relying on such evidence in reaching its verdict.") (citation omitted)).

Further, we note that the wrongful acts contained in the complained-of evidence were no more heinous than the charged offense—Patterson's murder of

27

Darling. Thus, the risk of unfair prejudice was relatively low. *See Gaulding*, 2022 WL 17986026, at *7 ("[B]ecause the extraneous offenses were no more heinous than the charged offenses, the risk of unfair prejudice was relatively low."); *Norwood v. State*, No. 03-13-00230-CR, 2014 WL 4058820, at *5 (Tex. App.—Austin Aug. 15, 2014, pet. ref'd) (mem. op., not designated for publication) ("When the extraneous offense is no more heinous than the charged offense, evidence concerning the extraneous offense is unlikely to cause unfair prejudice."); *see also James*, 623 S.W.3d at 549 (holding that third *Gigliobianco* factor weighed in favor of admission of extraneous-offense evidence that was "not more heinous than the charged offenses" but against admission of extraneous-offense evidence that was more heinous than the charged offenses); *Smith*, 314 S.W.3d at 593 (holding that "[t]here is nothing in the record to indicate [the defendant's] prior bad acts would 'lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged' in this murder case, especially given the trial court's lengthy Rule 403 limiting instruction").

Moreover, we note that the complained-of evidence was not scientific in nature, nor was it overly complex; thus, there was little risk of jury confusion. *See Gaulding*, 2022 WL 17986026, at *6 ("[B]ecause the evidence was not scientific or complex, there was little risk of jury confusion."); *James*, 623 S.W.3d at 550 ("Our review of the record shows that the extraneous-offense testimony was from lay witnesses, not experts, and it described the various abusive incidents in a factual

28

manner. None of the extraneous-offense evidence was scientific or complex."). These factors weigh in favor of the admission of the complained-of evidence.

As to the sixth *Gigliobianco* factor—the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted—Patterson complains that "[t]he State spent almost half of the time at trial proving up prior extraneous bad acts by [Patterson] against [Darling]." While conceding that "the amount of extraneous evidence was significant," the State argued that it "did not consume an inordinate amount of time or merely repeat evidence already admitted," noting that "[t]he complained-of evidence comprised of approximately 160 pages of testimony and 25 exhibits, and the evidence about the murder comprised of approximately 390 pages and 175 exhibits." Based on our review of the evidence, we agree with Patterson that the complained-of evidence consumed an inordinate amount of time at trial. This factor weighs against the admission of the complained-of evidence. *See Baxter*, 2023 WL 8268292, at *12; *James*, 623 S.W.3d at 551.

Balancing all six of the *Gigliobianco* factors, we hold that the trial court did not abuse its discretion by determining that the probative value of the complained-of evidence was not substantially outweighed by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Five out of the six *Gigliobianco* factors favor admission of the complained-of evidence. In this regard, even though the complained-of

29

evidence certainly had the potential to sway the jury to improperly convict Patterson based on character conformity, the probative value of the complained-of evidence was strong, the State had a need for it, the risk of unfair prejudice was relatively low, and any risk was minimized by the trial court's limiting instruction. *See Baxter*, 2023 WL 8268292, at *12 (holding that trial court did not abuse its discretion by admitting extraneous-offense evidence that accounted for "approximately 70% of the testimony" when five out of six *Gigliobianco* factors favored admission of the evidence); *Gaulding*, 2022 WL 17986026, at *7 (holding that trial court did not abuse its discretion by admitting extraneous-offense evidence when "the probative value of the evidence was strong, . . . the risk of unfair prejudice was relatively low," and the "risk was further minimized by the trial court's limiting instruction"); *James*, 623 S.W.3d at 551 (holding that trial court did not abuse its discretion by admitting complained-of evidence that "consumed a large portion of [the defendant's] trial" when "[f]ive out of the six *Gigliobianco* factors favor[ed] admission of the similar extraneous-offense evidence, and four of the six factors favor[ed] admission of the evidence of rape, sodomy, torture, and unlawful restraint").

### 5. Harm

Even if we assumed that the trial court abused its discretion by admitting the complained-of evidence, the record does not establish harm. Error in the admission of evidence in violation of Rules 403 and 404 is generally not constitutional error. *Perez v. State*, 562 S.W.3d 676, 691 (Tex. App.—Fort Worth 2018, pet. ref'd); *Byrd v.*

30

*State*, No. 04-08-00313-CR, 2009 WL 1900412, at *4 (Tex. App.—San Antonio July 1, 2009, pet. ref'd) (mem. op., not designated for publication). Because the error is not constitutional, we apply Rule 44.2(b). Tex. R. App. P. 44.2(b). That rule requires us to disregard any nonconstitutional error that does not affect the appellant's substantial rights. *Id.* A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

While the State emphasized Patterson's prior assaultive behavior of Darling throughout the trial, we note that there was also strong evidence indicating Patterson's guilt for murder. Patterson admitted to police that he had been involved in an argument with Darling on the night of the shooting—an argument in which he had

held a gun in his hand—and that he had accidentally shot Darling after she hit his hand during a "tussle" or a "scuffle." While Patterson stated that he was gathering his belongings to leave during the argument, detectives found no indication that he was in the process of leaving or that he had gathered anything other than his gun. Indeed, Patterson was found shirtless.

I.B. testified that Patterson and Darling had argued on the night of the shooting and that Darling had told Patterson to leave the home and give her the key. According to I.B., Darling gathered E.P. from the living room and took him back into the master bedroom during that argument. I.B. then heard a loud noise, and he ran into the bedroom and noticed Darling slumped on the bed with E.P. in her hands. I.B.'s version of events—that Darling was shot with E.P. in her hands—contradicts Patterson's version of events—that Darling was shot during a "tussle" or a "scuffle."

Evidence also belied Patterson's claim that the shooting was accidental. Christophe testified that the standard CW380 pistol comes with an internal firing pin safety that prevents the gun from firing when "the trigger is tripped or accidentally engaged." He further stated that the standard CW380 had a trigger pull of three pounds or greater. Murthy testified that the trajectory of Darling's gunshot wound was downward, noting that she would not expect to see such a trajectory if someone had made an upward smack at a gun. Murthy ultimately determined that the manner of Darling's death was homicide.

32

Moreover, Patterson's actions following the shooting indicate a consciousness of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (recognizing, in a sufficiency review, the jury may consider evidence showing a consciousness of guilt); *Page v. State*, No. 03-12-00137-CR, 2013 WL 4487546, at *4 (Tex. App.—Austin Aug. 15, 2013, pet. ref'd) (mem. op., not designated for publication) ("[T]he jury could have reasonably inferred from [the defendant's] attempted suicide and other behavior that he had a consciousness of guilt."). Responding officers found Patterson covered in blood and bleeding from neck wounds, and during his interviews with police, Patterson stated that he had attempted to kill himself after the shooting.

Based on our review of the record, even assuming that the trial court abused its discretion by admitting the complained-of evidence, we conclude that, in the context of the entire case against Patterson, any error in admitting the complained-of evidence did not have a substantial or injurious effect on the jury's verdict and did not affect Patterson's substantial rights. *See Macedo*, 629 S.W.3d at 240; *Haley*, 173 S.W.3d at 518; *Baxter*, 2023 WL 8268292, at *9; *see also Garcia*, 201 S.W.3d at 704 ("[T]here is no reason for us to believe that the jury had reasonable doubt that [the defendant] murdered [the victim] but convicted him anyway based on the [extraneous-offense] evidence."). Thus, we must disregard any such error. *See* Tex. R. App. P. 44.2(b). We overrule Patterson's first issue.

**B. Patterson's Complaint Regarding the Sufficiency of the Evidence**

In his second issue, Patterson argues that the evidence is insufficient to support his conviction because there is "little evidence of a culpable mental state."

**1. Standard of Review**

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the

evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021). We must scrutinize circumstantial evidence of a culpable mental state as stringently as other types of evidence. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). When the record supports conflicting inferences, a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution. *Petetan v. State*, 622 S.W.3d 321, 337 (Tex. Crim. App. 2021).

### 2. Applicable Law

A person commits murder if he or she "intentionally or knowingly causes the death of an individual" or if he or she "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(1), (2). "Although [S]ections 19.02(b)(1) and (b)(2) differ in their descriptions of the mental state required for culpability, jurors are not required to agree on the defendant's specific mental state; rather, they need only agree that the defendant possessed one of the alternate mental

states that satisfy the element of intent under the statute." *Yost v. State*, 222 S.W.3d 865, 877 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

A jury may infer intent or knowledge from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). "Intent and knowledge are fact questions for the jury and (absent a confession) are almost always proven through evidence of the circumstances surrounding the crime."[18] *Lopez v. State*, 672 S.W.3d 915, 923 (Tex. App.—Corpus Christ–Edinburg 2023, pet. ref'd). Intent to kill may also be inferred from the use of a deadly weapon or from the nature and extent of the injuries inflicted on the victim. *Id.* (first citing *Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992); and then citing *Felder v. State*, 848 S.W.2d 85, 90 (Tex. Crim. App. 1992)).

### 3. Analysis

Here, the evidence is sufficient to establish that Patterson had the requisite *mens rea* to support his conviction for Darling's murder. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2).

The evidence reflects that Darling and Patterson had a volatile relationship marked by violence. Darling's sister and friends testified that Patterson had physically abused Darling in the past and that she was afraid that Patterson was going to kill her.

---

[18]In his brief, Patterson acknowledges that "[i]t is true that a requisite culpable mental state is almost always proved by circumstantial evidence."

Witnesses also mentioned that Patterson had damaged Darling's property on occasions when she had not allowed him inside her home. One friend of Darling's testified that after Patterson had purchased a gun, Darling had indicated that she was fearful that Patterson "would use that gun to kill her" and that "she was going to make a will for her kids." The evidence also reflects that police were called to Darling's residence on several occasions to respond to domestic incidents involving Darling and Patterson, and despite Patterson's having been at one point "trespassed from" Darling's property, he continued to return. Around a month before her death, Darling told a friend that one reason for her remaining with Patterson was that she was scared that he would kill her if she left him.

As to the night of Darling's death, Patterson told police that he and Darling had gotten into an argument, ostensibly because he had taken too long in the shower. According to Patterson, Darling told him to leave, and while he was in the process of gathering his belongings, he grabbed a gun from the safe in the master closet. While walking from the master bathroom and closet to the master bedroom to gather his belongings, he continued to argue with Darling while holding the gun in his right hand. According to Patterson's account, during one of these trips, Darling grabbed his hand, they started to "wrestle" on the bed, and during that "tussle" or "scuffle," the gun in his hand "went off." Patterson maintained throughout his interviews with police that the shooting was an accident.

37

Other evidence, however, belies Patterson's claim that the shooting was an accident. I.B. testified that Darling had gathered E.P. from the living room and taken him into the master bedroom during the argument with Patterson. I.B. stated that shortly after Darling took E.P. to the bedroom, he heard a loud noise, so he ran into the bedroom and found Darling slumped on the bed with E.P. in her hands. The jury, as the ultimate judge of the weight and credibility to be given to the evidence, could have believed I.B.'s testimony that Darling had E.P. with her when she was shot. *See Martin*, 635 S.W.3d at 679. The jury could have also rationally concluded that Darling—a mother who was holding her baby and who had fears that her boyfriend would kill her—would not swipe at a gun held by Patterson during an argument. Instead, the jury could have rationally concluded that Patterson—a man who had abused Darling in the past and who had reacted angrily to past attempts by Darling to free herself from him—had intentionally shot Darling when she told him to leave the home and give her the key. The fact that detectives found no indication that Patterson was in the process of leaving or that he had gathered anything other than his gun would give credence to that view.

Moreover, testimony from a firearm and toolmark examiner and from the medical examiner supports the view that Patterson intentionally shot Darling. Christophe—the firearm and toolmark examiner—testified that the type of gun used in the shooting comes with an internal firing pin safety that prevents the gun from firing when "the trigger is tripped or accidentally engaged." Murthy—the medical

38

examiner—testified that the trajectory of Darling's gunshot wound was downward and that she would not expect to see such a trajectory if Darling had made an upward smack at the gun. Moreover, Murthy determined that the manner of Darling's death was homicide.

Finally, the evidence reflects that after the shooting, Patterson attempted to kill himself. According to his account, he first attempted to kill himself by using the gun, but it jammed. He then retrieved a knife and a pizza cutter from the kitchen and started stabbing himself when he heard the police arrive. The jury could have reasonably inferred from Patterson's attempted suicide that he had a consciousness of guilt. *See Lamerand v. State*, 540 S.W.3d 252, 261 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (holding that jury could have reasonably inferred that defendant's suicide attempt shortly after learning that he was under investigation for sexual assault evidenced a consciousness of guilt); *Perry v. State*, No. 08-12-00285-CR, 2014 WL 3051020, at *3 (Tex. App.—El Paso July 3, 2014, no pet.) (not designated for publication) ("[T]he jury was free to consider Appellant's apparent suicide attempt . . . as evidence of [a] consciousness of guilt.").

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Patterson intentionally or knowingly caused Darling's death or that he intended to cause serious bodily injury to Darling and committed an act clearly dangerous to

human life that caused Darling's death. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2);

*Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. We overrule Patterson's second issue.[19]

## IV. CONCLUSION

Having overruled Patterson's two issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 21, 2024

---

[19]To support his argument that the evidence is insufficient to support his conviction, Patterson cites *Stobaugh v. State*, 421 S.W.3d 787 (Tex. App.—Fort Worth 2014, pet. ref'd), a case he describes as "analogous" to this one. We find *Stobaugh* distinguishable. In *Stobaugh*, the defendant was convicted of murdering his missing estranged wife even though her body was never found, there was no murder weapon, no witnesses, no blood or DNA evidence, and "no forensic evidence establishing that a murder occurred or linking [the defendant] to a murder." *Id.* at 790. Given those circumstances, we held that the evidence was insufficient to convince any rational factfinder beyond a reasonable doubt that the defendant acted with the requisite *mens rea* necessary to support his conviction for murder. *Id.* Here, in contrast, we have, among other things, Darling's body with a gunshot wound to the head, the murder weapon, Patterson's statement that the gun "went off" during a "tussle" or a "scuffle" with Darling, testimony from a firearm and toolmark examiner that indicates that the type of gun used in the shooting contains a firing pin safety to prevent an accidental discharge of the gun, and testimony from a medical examiner that the manner of death was homicide. In short, we do not find *Stobaugh* to be "analogous."

40